# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **LARRY ARNETT** and **RONDA ARNETT**, individually and on behalf of all others similarly situated, | Case No.: 3:11-cv-01372-SI |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **BANK OF AMERICA, N.A.** and **BAC HOME LOANS SERVICING, L.P.**, | |
| Defendants. | |

Scott A. Shorr
Timothy S. DeJong
Nadine A. Gartner
STOLL BERNE
209 S.W. Oak Street, Suite 500
Portland, OR  97204

Eric L. Cramer
Patrick F. Madden
Shanon J. Carson
BERGER & MONTAGUE PC
1622 Locust Street
Philadelphia, PA  19103

Brett H. Cebulash
Kevin S. Landau
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY  10038

Of Attorneys for Plaintiffs

Peter D. Hawkes
Tanya Durkee Urbach
LANE POWELL, PC
601 S.W. Second Avenue, Suite 2100
Portland, OR  97204-3158

John C. Englander
Dennis N. D'Angelo
Matthew G. Lindenbaum
GOODWIN PROCTER LLP
53 State Street, Exchange Place
Boston, MA  02109

David L. Permut
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC  20001

       Of Attorneys for Defendants

**SIMON, District Judge**.

       In this putative class action, Plaintiffs Larry and Ronda Arnett ("Plaintiffs" or "the Arnetts") contend that Defendants Bank of America, N.A. and BAC Home Loan Servicing, L.P.[1] ("Defendants" or "BOA") "forced" Plaintiffs and the other putative class members "to purchase and/or maintain flood insurance in excess of the amounts required by federal law, in amounts greater than Defendants' secured interest in the property, and contrary to the amounts agreed upon in the relevant loan and mortgage documents." Complaint ("Compl.") at ¶ 2 (Dkt. 1). In their Complaint, the Arnetts assert statutory claims for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*; and Oregon's Unlawful Debt Collection Practices Act ("UDCPA"), Or. Rev. Stat. § 646.639. The Arnetts also assert four common law claims. Before the court is

---

[1] Bank of America, N.A. and BAC Home Loan Servicing, L.P. merged in July 2011. Compl. at ¶13; Answer at ¶ 13; Defs.' Mem. at 1 n.1.

Defendants' Motion for Judgment on the Pleadings (Dkt. 25). For the reasons discussed below, Defendants' motion is granted with respect to Plaintiffs' statutory claims and the tort claims of unjust enrichment and breach of fiduciary duty but denied with respect to Plaintiffs' contract claim (both express contract and implied covenant) and the remaining tort claim of conversion.

## BACKGROUND

### A.    National Flood Insurance Act

The Arnetts allegations are framed in part by the provisions of the National Flood Insurance Act ("NFIA"), 42 U.S.C. § 4001, *et seq.* Congress enacted NFIA in 1968 "in response to a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis." *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 387 (9th Cir. 2000). NFIA aimed to alleviate this concern by providing federally subsidized flood insurance to individuals and organizations in flood-prone areas. "The availability of government subsidized flood insurance did not, however, provide adequate incentive to attract extensive local community participation in the Flood Program." *Mid-America Nat. Bank of Chicago v. First Sav. & Loan Ass'n of S. Holland*, 737 F.2d 638, 641 (7th Cir. 1984).

Congress later amended NFIA to require that individuals or organizations situated in federally designated special flood hazard areas[2] obtain flood insurance coverage in order to be eligible for certain federal and private financing. *Id.* In particular, federally regulated private lenders are prohibited from making loans secured by real property situated in a special flood hazard area unless the borrower obtains flood insurance coverage for the life of the loan. 42 U.S.C. § 4012a(b)(1); *Paul v. Landsafe Flood Determination, Inc.*, 550 F.3d 511, 513 (5th Cir.

---

[2]    Special flood hazard areas are designated by the Administrator of the Federal Emergency Management Agency. *See* 42 U.S.C. § 4101.

2008) ("Any federally regulated lender making a loan secured by improved real estate located in a designated flood-risk zone must as a condition of making the loan require the purchase of insurance through the National Flood Insurance Program.").

In 1994, Congress again amended NFIA, providing that if a borrower fails to maintain at least a statutorily-set minimum amount of flood insurance coverage, the lender is required to purchase additional coverage on the borrower's behalf.[3] 42 U.S.C. § 4012a(e)(2); Pub. L. No. 103-325, 108 Stat. 2160; *see also Hofstetter v. Chase Home Fin., LLC*, No. C 10-01313-WHA, 2010 WL 3259773 (N.D. Cal. Aug. 16, 2010). To satisfy this requirement, the amount of flood insurance maintained on the property must be in "an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, whichever is less." 42 U.S.C. § 4012a(b)(1).

**B.    Factual Allegations[4]**

In July 2008, the Arnetts obtained a mortgage loan for $135,000 from KeyBank National Association ("KeyBank") to purchase residential property in Roseburg, Oregon. Compl. ¶ 21. In November 2008, Countrywide Bank took over servicing of the Arnetts' loan. Compl. ¶ 26. BOA later acquired Countrywide. *Id.* The Arnetts allege that the "mortgage was . . . transferred from Countrywide Bank to BOA (when BOA acquired Countrywide)."[5] *Id.*

---

[3]  Plaintiffs call this practice "force-placing" insurance.

[4]  On review of a Rule 12(c) motion for judgment on the pleadings, all "allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party." *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

[5]  BOA only admits "that it is currently the servicer of Plaintiffs' mortgage loan." Answer ¶ 26. BOA does not admit to owning the mortgage loan.

Because the Arnetts' property is located in a special flood hazard area, NFIA required the Arnetts to purchase flood insurance in order to obtain their mortgage loan from KeyBank. Compl. ¶ 22. The Arnetts' trust deed[6] securing their loan does not, on its own, expressly require the Arnetts to obtain and maintain flood insurance. The trust deed, however, requires the Arnetts to "keep the improvements now existing or hereafter erected on the Property" insured against any hazards "including, but not limited to, earthquakes and floods, for which Lenders requires insurance." Dkt. 23-1, Ex. 1. It also permits the lender to "obtain insurance coverage, at Lender's option and Borrower's expense" in the event that the Arnetts fail to maintain coverage. *Id.* Section five of the Arnetts' trust deed provides in part:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. . . .

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.

*Id.*

On the same day that the Arnetts signed the trust deed, the Arnetts also signed a document titled "Notice of Special Flood Hazards and Availability of Federal Disaster Relief Assistance" (hereinafter the "NSFH"). Dkt. 23-1, Ex. 2. Unlike the trust deed, the NSFH expressly required the Arnetts to purchase and maintain flood insurance. It provides in part:

---

[6] Under Oregon law, lenders and borrowers may secure residential home loans with either a mortgage or a trust deed. *See generally* Or. Rev. Stat. Chapters 86 and 88. Because the term "mortgage" is used colloquially to refer to both mortgages and trust deeds, and because the parties often refer to the Arnetts' trust deed as the mortgage in their briefing, the court will use the terms "trust deed" and "mortgage" interchangeably.

> Federal law will not allow us to make you the loan that you have applied for if you do not purchase flood insurance. The flood insurance must be maintained for the life of the loan. If you fail to purchase or renew flood insurance on the property, Federal law authorizes and requires us to purchase the flood insurance for you at your expense.
>
> - [. . .]
>
> - At a minimum, flood insurance purchased must cover the lesser of:
>
>   (1)   the outstanding principal balance of the loan; or
>
>   (2)   the maximum amount of coverage allowed for the type of property under the [National Flood Insurance Program ("NFIP")].
>
> Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located.

*Id.* Near the bottom of the NSFH are signature lines for both the borrower and the lender. The Arnetts signed and dated the NSFH; there is no signature on the line for the lender.

Before closing, the Arnetts received a document titled "Flood Insurance Requirements" (hereinafter the "FIR"). Dkt. 23-1, Ex. 3. It contains the KeyBank logo and states that the lender "requires that an original flood insurance policy (or application for such insurance) and a prepaid receipt for the first year's premium . . . be presented at closing." *Id.* It also provides that the "enclosed Flood Notice must be signed and returned to Lender." *Id.* Like the NSFH, this document defines the amount of coverage required. The FIR provides:

> Flood insurance coverage must be for the lower of:
>
> -   100 % of the replacement cost of the insurable value of the improvement.
>
>           OR
>
> -   The maximum insurance available under the appropriate National Flood Insurance Administration Program.
>
>           OR

-   The Outstanding principal balance of the loan plus any junior lien loan amounts.

*Id.* Unlike the NSFH, the FIR does not include signature lines.

The Arnetts obtained a $250,000 flood insurance policy from Harford Insurance Company at the time the loan was originated. Compl. ¶ 25. They also maintained an excess flood insurance policy of $203,000 from Lloyd's of London. *Id.* The Arnetts obtained a separate and independent policy for their garage totaling $27,500. *Id.*

On September 14, 2010, BOA sent the Arnetts a letter stating that the Arnetts had failed to maintain adequate flood insurance. Compl. ¶ 32. This letter stated that the Arnetts must obtain $87,280 in additional flood insurance coverage. *Id.* It also stated that "to maintain acceptable insurance, we [Defendants] require that you maintain flood insurance coverage in an amount at least equal to the lesser of: (1) the maximum insurance available under the NFIP for participating communities, which is currently $250,000; or (2) the replacement value of the improvements to your Property." *Id.* In response to the letter of September 14, 2010, the Arnetts provided Defendants with proof of adequate insurance. Compl. ¶ 34. Nevertheless, on November 4, 2010, Defendants obtained an $87,280 flood insurance policy (the "2010 Garage Policy"[7]) for the Arnetts and charged the Arnetts $445.13 through an escrow account. Compl. ¶ 34; Answer ¶ 34. Several months later, Defendants refunded this amount. Answer ¶ 34.

On June 16, 2011, Defendants sent another letter to the Arnetts asserting that the Arnetts had no flood insurance covering the house on their property. Compl. ¶ 37. The Arnetts replied and attached proof that they had continued to maintain a $250,000 flood insurance policy covering the house. Compl. ¶ 38. Defendants disregarded the Arnetts reply and, on August 2,

---

[7]   There do not appear to be any allegations in the Complaint that this flood insurance policy was intended to cover the Arnetts' garage. BOA, however, refers to this policy as the "2010 Garage Policy" in their briefing; for the sake of clarity, the court does so as well.

2011, purchased a $250,000 flood insurance policy (the "Home Policy") on the Arnetts' behalf. Compl. ¶¶ 39-40. Defendants charged the Arnetts' escrow account a premium of $2,448 for this Home Policy. Compl. ¶ 40. Defendants purchased this policy from Balboa Insurance Group ("Balboa"), formerly a wholly-owned subsidiary of BOA. *Id.*; Compl. ¶ 4. Defendants also purchased a $22,500 flood insurance policy (the "2011 Garage Policy") for the Arnetts' detached garage, and charged the Arnett's escrow account an additional premium of $114.75 for this policy. Compl. ¶ 40; Answer ¶ 40.

Defendants refunded the premium for the Home Policy in October 2011. Answer ¶ 40. Defendants refunded $57.68 toward the 2011 Garage Policy premium in December 2011. Thus, at present, Defendants have fully refunded the first two flood insurance policies—the 2010 Garage Policy and the Home Policy—that they purchased on the Arnetts' behalf and have refunded approximately one-half of the premium for the third policy—the 2011 Garage Policy. *See* Reply Memorandum in Support ("Defs.' Reply") at 1 n.2 (Dkt. 51).

As explained above, NFIA requires lenders to purchase additional flood insurance coverage on behalf of a borrower when the borrower fails to maintain the statutorily-mandated minimum amount of coverage. The Arnetts allege, however, that "BOA imposes [flood insurance] coverage requirements beyond that required by" NFIA. Compl. ¶ 48. Furthermore, the Arnetts contend that BOA engages "in [this] practice[] in order to realize unfair financial gains from class members. . . . By adding the cost of force-placed insurance to borrowers' loan balances, Defendants earn additional interest on the amounts charged, and cause borrowers to incur additional costs and fees." Compl. ¶ 49. Finally, the Arnetts allege that by purchasing flood insurance for its borrowers even when it is unnecessary or in excess of NFIA's requirements, Defendants earn commissions for Balboa and their "other insurance affiliates[.]" Compl. ¶50.

**STANDARDS**

A Rule 12(c) "motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)). In addition, "to survive a motion to dismiss, a complaint must contain sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (*Iqbal* standard applies to review of Rule 12(c) motions).

**DISCUSSION**

In their Complaint, the Arnetts assert four common law claims and three statutory claims. Their claims are: (1) breach of contract, including both breach of express contract and breach of the implied covenant of good faith and fair dealing; (2) unjust enrichment; (3) conversion; (4) breach of fiduciary duty; (5) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; (6) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*; and (7) violation of Oregon's Unlawful Debt Collection Practices Act ("UDCPA"), Or. Rev. Stat. § 646.639. Each of the Arnetts' claims are framed by their claim for breach of express contract. The court, therefore, begins with that claim.

**A.      Breach of Express Contract**

To state a claim for breach of contract under Oregon law, a "plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (internal quotation marks omitted). The Arnetts allege that BOA breached the "original mortgage contract" by requiring the Arnetts to maintain more flood insurance than required by the terms of the contract. Compl. ¶¶ 93-97. BOA argues that the Arnetts' breach of contract claim must be dismissed because the "[m]ortgage unambiguously grants Bank of America the right to choose the 'amounts' of flood insurance on the property[.]" Defendants' Memorandum in Support ("Defs.' Mem.") at 13 (Dkt. 26).

**1.      The documents constituting the contract**

Before interpreting a written contract, the court must determine what documents form the contract. The Arnetts contend that the contract between the parties consists of the trust deed, the NSFH, and the FIR. The Complaint quotes a portion of the FIR and refers to it as the "original contract." Compl. ¶ 95. In their briefing, the Arnetts argue that the NSFH is also "part of the contract formed by the parties at the time of closing." Plaintiffs' Memorandum in Opposition ("Pls.' Mem.") at 14 (Dkt. 40). BOA disagrees. It maintains that neither the FIR nor the NSFH is "part of the mortgage contract. The Mortgage itself does not incorporate either of the Flood Notices by reference, nor does either of the Flood Notices indicate it is part of the Mortgage." Defs.' Mem. at 14.

Under Oregon law, "[o]ne document need not expressly incorporate the other by reference if the connection between them is unmistakable[.]" *McInnis v. Lind*, 198 Or. App. 139, 149 (2005). Oregon courts have identified three factors that, when present together, demonstrate

that multiple documents should be construed as a single contract: (1) the documents are made by the same parties, *Hays v. Hug*, 243 Or. 175, 177 (1966); (2) the documents are executed at or about the same time, *id.*; and (3) the documents are part of the same transaction, *id.*; *First Interstate Bank of Oregon, N.A. v. Morris*, 120 Or. App. 46, 48 (1993).

The trust deed and the NSFH satisfy all three factors. First, both documents reference the same parties—the Arnetts and the original lender, KeyBank. Second, the Arnetts signed both documents on the same day. Third, each document contains terms suggesting that it is part of the same transaction—the Arnetts' home loan. Both the Arnetts and BOA agree that the NSFH was provided to the Arnetts in connection with the closing. Defs.' Mem. at 14; Pls.' Mem. at 14. Moreover, the NSFH references the loan, the flood insurance requirements required by the lender to complete the loan, and the closing. In addition, the NSFH contains indicia or language of a contract. The NSFH states that "Borrower(s) *agree* to furnish" a flood insurance application and proof of payment. *See Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 134 (the phrase "it is agreed" is language that reflects existence of a contract). The NSFH also contains signature lines for both the borrowers and the lender (although the lender line is unsigned).[8] The court finds, therefore, that the trust deed and the NSFH must be read together as a single contract.

The court is not convinced, however, that the FIR is part of the contact. The FIR does not name the Arnetts; instead, it appears to be a form notice. In addition, there is no evidence

---

[8]  BOA contends that NSFH is not a contract, but merely a notice that "KeyBank was required to provide under federal banking regulations." Defs.' Reply at 9. BOA asserts that the language of the NSFH "is identical" to the language in a sample notice provided in the regulations. *Id.*; *see* 12 C.F.R. Pt. 22, App. A. BOA's assertion, however, is not entirely correct. Although the language in the sample notice matches the main body of text in the NSFH, the NSFH contains additional text not in the sample notice, including the statement that "Borrower(s) agree to furnish," and the signature lines for borrower and lender. KeyBank's additions to the sample notice suggest that the NSFH was also intended not only to serve as a notice, but was intended to form a portion of the parties' contract.

demonstrating *when* the Arnetts received the FIR; in fact, the FIR's text suggests that it may have been provided some time before the closing. Finally, unlike the NSFH, the FIR does not have indicia of contract, such as the language of agreement or signature lines.

### 2.    The alleged breach

The Arnetts claim that Defendants breached the "original mortgage contract," Compl. ¶ 95, by requiring "payment for additional and excessive flood insurance that was not required under the contract." Compl. ¶ 97. BOA argues that it did not breach the contract because, even when construing the NSFH as part of the contract, the contract "unambiguously" afforded BOA the discretion to set the amount of flood insurance required. Defs.' Mem. at 13-15. To determine whether the Arnetts' allegations state a claim for breach, the court must first interpret the contract. Specifically, the court must decide whether, as the Arnetts argue, the flood insurance provisions in the contract can be reasonably understood as fixing the amount of flood insurance that is required. Relatedly, the court must decide whether, as BOA argues, the flood insurance provisions in the contract grant BOA the discretion to change the amounts of required flood insurance.

The Oregon courts have established a three-step process for interpreting the provisions of a contact. First, the court determines whether, as a matter of law, the relevant provision is ambiguous. *McKay's Mkt. of Coos Bay, Inc. v. Pickett*, 212 Or. App. 7, 12 (2007). A "contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011). If the provision is unambiguous, the analysis ends. *Yogman v. Parrott*, 325 Or. 358, 361 (1997). If the provision is ambiguous, the court proceeds to the second step. *Id.* at 363. The second step must be determined by the trier of fact. *Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342, 347-

48 (1994). At the second step, the trier of fact examines extrinsic evidence of the contracting

parties' intent. *Yogman*, 325 Or. at 363. If, after examining extrinsic evidence, the contract is still

ambiguous, "appropriate maxims of construction" are applied at the third stage. *Id.* at 364.

 If the relevant provisions when read together—Section five of the trust deed and the

NSFH—are ambiguous, and there exists at least one plausible interpretation in which BOA's

conduct constitutes a breach, dismissal of the Arnetts' breach of contract claim at this stage of

the proceedings is inappropriate. *See Westlands Water Dist. v. United States Dep't of Interior*,

850 F. Supp. 1388, 1408 (E.D. Cal. 1994) ("A motion to dismiss cannot be granted against a

complaint to enforce an ambiguous contract."); *see also Roling v. E*Trade Sec., LLC*, 756 F.

Supp. 2d 1179, 1188-89 (N.D. Cal. 2010) ("Because there are two reasonable interpretations of

this provision, the contract is ambiguous. Since no extrinsic evidence can be considered at this

stage, the motion to dismiss the breach of contract claim must be denied.").

 Section five of the Arnetts' trust deed provides that the Arnetts must keep buildings on

the property insured against fire and "any other hazards including, but not limited to, earthquake

and floods, for which the Lender requires insurance." Section five also permits the lender to set

the amount of insurance coverage required: "This insurance shall be maintained in the amounts

(including deductible levels) and for the periods that Lender requires." BOA contends that these

provisions "grant[] Bank of America the right to choose the 'amounts' of flood insurance on the

property." Defs.' Mem. at 13. Further, BOA argues, the NSFH neither alters nor conflicts with

the trust deed because it "merely specif[ies] the 'minimum' flood insurance required by the

Lender[.]" *Id.* at 15. Thus, even when construing the NSFH as part of the contract, BOA "had the

discretion to set their flood insurance coverage amount" under the contract. *Id.* at 16. The court

finds that this is a plausible interpretation of the contact. *See Lass v. Bank of Am., N.A.*, No.

CIV.A. 11-10570-NMG, 2011 WL 3567280 *4 (D. Mass. Aug. 11, 2011) (finding that similarly worded mortgage and flood notice "unambiguously gave defendants the discretion to determine the appropriate amount of flood insurance and to purchase that insurance on plaintiff's behalf should she fail to do so").

There exists, however, an alternative interpretation that is also plausible. Under this interpretation, Section five of the trust deed does not permit BOA discretion to set the amount of flood insurance coverage that the borrower must maintain because the NSFH "fills in" the trust deed's open-ended, discretionary terms. *See* Pls.' Mem. at 14. As noted above, the trust deed does not expressly require the Arnetts to maintain flood insurance on the property; rather, the trust deed merely provides that the lender *may* require flood insurance. The trust deed also does not set the amount of flood insurance that the borrower must maintain; it provides that the borrower must maintain the amount of insurance that the "Lender requires." Finally, the trust deed provides that the amount of insurance that the lender requires "can change during the term" of the loan.

The NSFH—which, as discussed above, is part of the contract—sets forth what the "Lender requires." First, it provides that the Arnetts must maintain flood insurance. Second, it fixes the amount of flood insurance that the Arnetts must maintain: "At a minimum, flood insurance purchased must cover the lesser of" the outstanding loan balance or the maximum amount of coverage provided by the NFIP. Finally, the NSFH provides that "[t]he flood insurance must be maintained for the life of the loan." In this provision, the definite article "the," which precedes "flood insurance," signals that the flood insurance that must be "maintained for the life of the loan" is the same "flood insurance" described in the provision fixing the amount of insurance that the Arnetts must maintain. In other words, the NSFH sets, or "fills in," the amount

of flood insurance that the lender requires for the life of the loan and that amount is not subject to change, except as expressly provided for in the NSFH.[9] This interpretation gives full effect to the NSFH's specific terms governing flood insurance. *See Williams*, 351 Or. at 379 (court must "construe the contract so as to give effect to all of its provisions"); *see also* Or. Rev. Stat. § 42.230 ("where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all").

BOA contends that this interpretation fails to account for the phrase "[a]t a minimum," which precedes the NSFH's description of the required amount of flood insurance coverage. According to BOA, the phrase "[a]t a minimum" means the NSFH merely identifies the minimum amount of coverage that the lender may require. Defs.' Mem. at 14-16; Defs.' Reply at 7-8. As noted above, this is a plausible interpretation. It is also plausible, however, that the phrase "[a]t a minimum" does not mean that the amount of coverage specified in the NSFH is the minimum that *the lender may require*. Instead, "[a]t a minimum" could mean that the amount of coverage specified in the NSFH is not the maximum that *the borrower may purchase*. In other words, it is also a plausible interpretation that the NSFH firmly fixes the amount of coverage that the lender requires but does not prohibit the borrower from obtaining additional coverage if that is what the borrower wants to do. This alternative interpretation also makes financial sense: the lender's financial interest in the property is equal to the amount of the outstanding loan, but the borrower's interest may be the entire replacement value of the property.

---

[9] The NSFH provides that "flood insurance purchased must cover the lesser of" the outstanding loan balance or the maximum amount of coverage provided by the NFIP. Because Congress or the Federal Emergency Management Agency may change the amount required under the NFIP, the amount of flood insurance required by the NSFH may change. *See* 42 U.S.C.A. § 4013 and 44 C.F.R. § 61.6.

Further, if the original lender intended the NSFH to only set the minimum amount of flood insurance that the lender could require, it could have easily clarified the NSFH by adding clearer and more explicit language. The lender could have stated, for example, that the lender reserved the right, any time during the life of the loan, to require more flood insurance than is required by the federal minimum described in the NSFH. This would have put a borrower on clear notice of what could be required and thus render implausible the Arnetts' alternative interpretation of the contract. The lender, however, did not do that.

Under Plaintiffs' alternative interpretation, BOA breached the contract by requiring the Arnetts to obtain more coverage than required by the NSFH. Pls.' Mem. at 17. Because there are at least two plausible interpretations of the contract, the court finds that the contract is ambiguous. Judgment on the pleadings, therefore, is inappropriate.

**B.    Breach of Implied Covenant of Good Faith and Fair Dealing**

Under Oregon law, every contract contains an implied duty of good faith and fair dealing. *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2011). A duty of good faith and fair dealing, however, "may be implied as to a disputed issue *only* if the parties have not agreed to an express term that governs that issue." *Oregon Univ. Sys. v. Oregon Pub. Employees Union, Local 503*, 185 Or. App. 506, 511 (2002) (emphasis added). Thus, the Arnetts' breach of the implied duty of good faith and fair dealing claim ("good faith claim") depends on whether the mortgage contract is found to contain an express term that sets the amount of required flood insurance coverage. Compl. ¶ 99. If the contract expressly sets the amount of flood insurance coverage required, and BOA does not have discretion to alter that amount, the Arnetts' may only assert a claim for breach of express contract, not for breach of the implied duty of good faith and fair dealing. If, on the other hand, the contract affords BOA

discretion to set the required amount of flood insurance, the Arnetts may have a claim for breach of the implied duty of good faith and fair dealing, although not for breach of the express terms of the contract. *See Oregon Univ. Sys.*, 185 Or. App. at 511 ("where both types of claims are at issue on review, a breach of express contract claim should be analyzed before a claim of breach of the implied duty of good faith and fair dealing").

If the trier of fact concludes that the contract provides BOA with discretion to set the amount of required flood insurance coverage, the extent to which the Arnetts may still maintain their good faith claim is unclear. As discussed below, Oregon's law regarding the implied duty of good faith and fair dealing has undergone substantial evolution over the last twenty-five years. Because the viability of the Arnetts' good faith claim is dependent on the trier of fact's interpretation of the contract, and because the parties have not thoroughly briefed Oregon's implied duty of good faith and fair dealing law, the court declines at this time to decide whether the Arnetts' have stated a claim for breach of the implied covenant.

Nonetheless, before moving on, the court describes some of the changes in Oregon's law in order to develop the issue for the parties' further briefing at a later stage of these proceedings. The Arnetts argue that the implied duty of good faith and fair dealing prohibits one party from "utilize[ing] the discretion it may have under the contract to frustrate the parties' reasonable expectations under the contract." Pls.' Mem. at 20. The Arnetts base this argument on the Oregon Supreme Court's decision in *Best v. U.S. Nat. Bank of Oregon*, 303 Or. 557 (1987). Pls' Mem. at 20-21. In *Best*, the Court held that when one party to a contract has unlimited discretion to set an open-ended price term, that party's discretion is circumscribed by both parties' reasonable expectations:

> When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will

> be exercised for particular purposes. If the discretion is exercised for purposes not
> contemplated by the parties, the party exercising discretion has performed in bad
> faith.

*Id.* at 563. According to *Best*, determination of the parties' reasonable expectations involves a

question of fact. *Id.* at 565-66 ("we believe that there is a genuine issue of material fact whether

the Bank set its . . . fees in accordance with the reasonable expectations of the parties"). The

Court considered, for example, what fees the parties discussed at the time the contract was

executed and what the parties subjectively understood the agreement to entail. *Id.* at 565-66.

In several later cases, however, the Oregon Supreme Court appears to have constrained

its holding in *Best*. In *Tolbert v. First Nat. Bank of Oregon*, 312 Or. 485 (1991), which began as

a companion case to *Best*, the Court held that "it is only the objectively reasonable expectations

of parties that will be examined in determining whether the obligation of good faith has been

met." *Id.* at 494. Accordingly, the Court found that the parties' agreement to a contract that

expressly provided one party with discretion to set price terms was evidence of the parties'

reasonable expectations. *Id.*

In *Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342 (1994), and *Uptown Heights

Assoc. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638 (1995), the Court went further and appears to

have held that the express terms of the contract represent the *only* relevant evidence of the

parties' reasonable expectations. Thus, when a contract expressly provides for a unilateral

exercise of discretion, the duty of good faith cannot circumscribe that discretion: "[T]he duty of

good faith operates to effectuate the reasonable expectations of the parties as determined under

the terms of their contract. Here, those terms demonstrate that the parties agreed to—that is,

reasonably expected—a unilateral, unrestricted exercise of discretion." *Pac. First Bank*, 319 Or.

at 354; *Uptown Heights Assoc. Ltd. P'ship*, 320 Or. at 647-48 ("the reasonable contractual

Page 18 – OPINION AND ORDER

expectations of the parties are shown[] by the *unambiguous* terms of the contract" (emphasis

added; internal quotation marks and citation omitted)). Neither case, however, appears to discuss

how the law governing the implied covenant of good faith may apply to a contract that is

ambiguous.

 In addition, when a contract provides for discretion, but does not provide for a method of

exercising that discretion, the duty of good faith and fair dealing may still apply. *See Uptown

Heights Assoc. Ltd. P'ship*, 320 Or. at 647 ("*Best* is inapposite[] because in that summary

judgment case that bank had the discretion to fill in an open price term, and no method of setting

the . . . fee was spelled out in the depositors' contracts."). Further, several more recent Oregon

Court of Appeals cases have found that determination of the parties' reasonable expectations

raises a question of fact and may include evidence from outside the terms of the contract. *See,

e.g.*, *Brown v. Am. Prop. Mgmt. Corp.*, 167 Or. App. 53, 63 (2000) ("upon our review of the

record, we conclude that there is evidence . . . from which a jury could have concluded that

defendant exercised its authority . . . in bad faith"); *Cantua v. Creager*, 169 Or. App. 81, 97

(2000) ("the question of whether the defendant acted with the requisite bad motive is a question

of fact for the jury."); *Iron Horse Eng'g Co., Inc. v. Nw. Rubber Extruders, Inc.*, 193 Or. App.

402, 421 (2004) ("holding the parties to industry standards and practices effectuates the

reasonable contractual expectations of the parties"). The court will await a more thorough

presentation by the parties of these issues at the appropriate time later in these proceedings.

**C.     Unjust Enrichment**

 The "elements of the quasi-contractual claim of unjust enrichment are 'a benefit

conferred, awareness by the recipient that a benefit has been received and, under the

circumstances, it would be unjust to allow retention of the benefit without requiring the recipient

to pay for it.'" *Summer Oaks Ltd. P'ship v. McGinley*, 183 Or. App. 645, 654 (2002) (quoting

*Jaqua v. Nike, Inc.*, 125 Or. App. 294, 298 (1993). There "cannot be a valid legally enforceable

contract and an implied contract covering the same services." *Prestige Homes Real Estate Co. v.*

*Hanson*, 151 Or. App. 756, 762 (1997). In the first count of their Complaint, the Arnetts' allege

that they conferred a benefit to Defendants "in the form of overcharges for force-placed

insurance policies," Defendants have knowledge of this benefit, and Defendants "will be unjustly

enriched if they are allowed to retain the benefit[.]" Compl.¶¶ 64, 67-68. BOA argues that the

unjust enrichment claim must be dismissed because a valid contract—the mortgage—covers the

services at issue—flood insurance coverage. Defs.' Mem. at 19.

      In response, the Arnetts argue that BOA "refuses to admit that it is a party to the

mortgage contract, admitting only that it is the servicer of the mortgage." Pls.' Mem. at 27

(emphasis omitted). At oral argument, however, BOA expressly admitted being party to the

contract.[10] Oral Argument Transcript at 13-14. The Arnetts' unjust enrichment claim is,

therefore, provisionally dismissed. If it later becomes evident that BOA is not party to, or

otherwise obligated by, the Arnetts' contract, the court may reinstate this claim.

---

[10] The Arnetts argue that even if BOA is a party to the contract, their unjust enrichment
claim should not be dismissed because BOA's "improper conduct . . . is extrinsic to the
contract." Pls.' Mem. at 30. As noted above, however, unjust enrichment claims are only viable
where a contract does not cover the services at issue. Here, the parties do not dispute that the
contract covers flood insurance. The fact that a party may have engaged in conduct that is not
authorized by the contract to the detriment of the other party does not permit the other party to
maintain both unjust enrichment and breach of contract claims. Because the contract covers flood
insurance and both BOA and the Arnetts are party to it, BOA's alleged conduct constituting a
breach is redressable only by a breach of contract claim. *Ken Hood Const. Co. v. Pac. Coast*
*Const., Inc.*, 203 Or. App. 768, 772 (2006) ("if the parties have a valid contract, any remedies for
breach flow from that contract, and a party cannot recover in *quantum meruit* for matters covered
by the contract").

**D.    Conversion**

"To state a claim for conversion, a party must establish the intentional exercise of dominion or control over a chattel that so seriously interferes with the right of another to control it that the actor may justly be required to pay the full value of the chattel." *Emmert v. No Problem Harry, Inc.*, 222 Or. App. 151, 159-60 (2008). The Arnetts allege that Defendants unlawfully converted "specific and readily identifiable funds from [Defendants'] mortgage customers' escrow accounts" and retained those "funds unlawfully without consent of Plaintiffs[.]" Compl. ¶¶ 118, 120. BOA argues that the Arnetts' "conversion claim must fail for the same reason their breach of contract claim fails." Defs.' Mem. at 19. That is, BOA argues, "because Bank of America acted within the discretion granted it by the Mortgage, and thus it never interfered with [the] rights of Plaintiffs[.]" Defs.' Mem. at 19. As noted above, the Arnetts have stated a claim for breach of contract. Because BOA bases its response to the Arnetts' conversion claim on BOA's response to the contract claim, the Arnetts conversion claim survives Defendants' motion for judgment on the pleadings.

In its reply brief, BOA argues that the Arnetts conversion claim must be dismissed for an "independent reason." Defs.' Reply at 16. BOA argues under Oregon law there can be no conversion of money unless it was "'wrongfully received by the party charged with conversion.'" *Id.* (quoting *Wood Indus. Corp. v. Rose*, 271 Or. 103, 108 (1975) (internal quotation marks and citation omitted)). BOA contends that it never "wrongfully received" money from the Arnetts: "Plaintiffs do not state a conversion claim with respect to either [the 2010 Garage Policy or the Home Policy] for the independent reason that Bank of America has not received—much less 'wrongfully received'—money from [the Arnetts] for flood insurance premiums." *Id.* The court declines at this time to consider this "independent reason" because it

was raised for the first time in BOA's reply brief. *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief.").

**E.    Breach of Fiduciary Duty**

The Arnetts also claim that BOA breached its fiduciary duty to the Arnetts by "unilaterally using escrow funds to purchase forced-placed flood insurance that Plaintiff . . . w[as] not required to obtain[.]" Compl. ¶ 111. To state a claim for breach of fiduciary duty, the Arnetts must first establish that BOA owed them a fiduciary duty. *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 160 (2001) ("unless plaintiff's relationship with . . . defendant qualifies as the type of 'special relationship' that gives rise to" a fiduciary duty, no breach of duty can have occurred). Under Oregon law, the existence of a fiduciary duty depends on whether the parties are in a special relationship such that one party "exercise[s] independent judgment in the [other] party's behalf and in the [other] party's interests":

> Another way to characterize the types of relationships in which a heightened duty of care exists is that the party who owes the duty has a *special responsibility* toward the other party. This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests.

*Conway v. Pac. Univ.*, 324 Or. 231, 240 (1996) (emphasis in original). Ordinarily, an escrow holder does not owe a fiduciary duty to a depositor. *McDonald v. Title Ins. Co. of Oregon*, 49 Or. App. 1055, 1059 (1980). An escrow holder may have fiduciary duties, however, where the escrow terms "differ significantly from usual escrow arrangements." *Ainslie v. First Interstate Bank of Oregon*, N.A., 148 Or. App. 162, 180 (1997). In *Ainslie*, the Oregon Court of Appeals found that an Oregon Administrative Rule governing the establishment of escrow accounts for certain securities transactions, which "expressly requires that a trust relationship exist," created a fiduciary relationship between the escrow holder and investors. *Id.* at 180-83.

Page 22 – OPINION AND ORDER

The Arnetts allege that BOA owed them a fiduciary duty because BOA is "obligated to hold [the] escrow funds in trust[.]" Compl. ¶ 110.  This appears to a conclusory allegation. Section three of the trust deed, which contains provisions concerning the use of an escrow account for the payment of insurance premiums, does not indicate that escrow funds are to be held "in trust" for the benefit of the Arnetts. No other document that has been presented to the court requires BOA to hold escrow funds "in trust" for the benefit of the Arnetts. The court is not required to accept as true a plaintiff's allegations that "do nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegation." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In addition, the Arnetts do not allege any other circumstances that would indicate that they are in a special relationship with BOA. The Arnetts do not allege, for example, that they authorized BOA to exercise independent judgment on their behalf. Moreover, the Arnetts' relationship with BOA as borrower and lender is not fiduciary in nature. *Mcdaniel v. BAC Home Loans Servicing, LP*, No. 10-6143-HO, 2011 WL 1261387 *6 (D. Or. Mar. 31, 2011) (citing *Uptown Heights Assoc. Ltd.*, 320 Or. at 650). Accordingly, the Arnetts have failed to establish that BOA owed them a fiduciary duty. Their claim for breach of fiduciary duty is, therefore, dismissed.

## F.    Truth in Lending Act

TILA, 15 U.S.C. § 1601, *et seq.*, "requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights . . . and it prescribes civil liability for any creditor who fails to do so[.]" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004). "TILA entrusts the Federal Reserve Board with implementation of the Act, and the agency has imposed even more precise disclosure requirements via

Regulation Z," codified at 12 C.F.R. §§ 226.1 *et seq. Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009) (internal quotation marks omitted); *see* 15 U.S.C. § 1607. In particular, 15 U.S.C. § 1638 and 12 C.F.R. § 226.18, which govern closed-end transactions[11] such as residential home loans, require that the creditor must disclose the credit's "finance charge" before "the credit is extended." 15 U.S.C. § 1638(a)(3), (b)(1); 12 C.F.R. §§ 226.17(b), 226.18(d).

TILA defines the "finance charge" as, in part, "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."15 U.S.C. § 1605(a). In general, premiums "or other charge[s] for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss" are part of the "finance charge" that the creditor must disclose. 15 U.S.C. § 1638(a)(5). There is, however, an exception: A creditor need not disclose "[p]remiums for insurance against loss of or damage to property" if the "insurance coverage may be obtained from a person of the consumer's choice, and this fact is disclosed." 12 C.F.R. § 226.4(d)(2).

The Arnetts appear to allege two separate theories under which BOA violated TILA: In one, the Arnetts allege that BOA violated TILA by failing to include the cost of flood insurance premiums in the finance charge at the time the original lender and the Arnetts consummated the mortgage loan. In the other, the Arnetts allege that BOA was required to issue new TILA

---

[11] TILA provides distinct requirements for open-end and closed-end credit arrangements. Open-end credit plans are those in which "the creditor reasonably contemplates repeated transactions." 15 U.S.C. § 1602(j); 12 C.F.R. § 226.2(a)(20). Credit cards and home equity lines of credit are examples of open-end credit plans. *See Hofstetter v. Chase Home Fin., LLC*, 751 F. Supp. 2d 1116, 1124 (N.D. Cal. 2010). Closed-end transactions "includes any credit arrangement that does not fall within the definition of open-end credit." 12 C.F.R. Pt. 226, Supp. I; 12 C.F.R. § 226.2(a)(10). "The disclosure requirements for open-end credit transactions and closed-end credit transactions are segregated into different sections of the regulations." *Rendler v. Corus Bank*, 272 F.3d 992, 998 (7th Cir. 2001).

disclosures when BOA "chang[ed] the terms of mortgage loans . . . after origination without consent and demand[ed] more insurance than previously required[.]" Compl. ¶ 76. Under either theory, the Arnetts have failed to state a claim for violation of TILA.

With respect to the Arnetts' first theory, the Arnetts have not sufficiently pled that flood insurance premiums constituted a "finance charge" that the original lender was required to disclose under 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.18. The trust deed provides in Section five that the Arnetts may choose their own insurers. In addition, BOA states that on the date the loan was consummated, the Arnetts received a notice stating that the Arnetts could obtain insurance from "anyone that is acceptable to the creditor." Defs.' Mem. at 26. The Arnetts have not alleged otherwise. Consequently, the required flood insurance satisfies the exception provided in 12 C.F.R § 226.4(d)(2), and the initial lender was not required to include the cost of flood insurance premiums in the finance charge.

With respect to the Arnetts' second theory, the Arnetts have failed to establish that TILA required BOA to issue new TILA disclosures when BOA placed additional flood insurance. As noted above, except in certain circumstances not applicable here, TILA requires the creditor to make disclosures *before* the credit is extended.[12] 15 U.S.C. § 1638(b)(1) ("the disclosures required . . . shall be made before the credit is extended"); 12 C.F.R. § 226.17(b) ("The creditor shall make disclosures before consummation of the transaction." [13]). Even if TILA required

---

[12] TILA requires the creditor to issue new disclosures after a refinancing or the assumption of the mortgage loan by a new obligor, and in certain variable-rate adjustments. 12 C.F.R. § 226.20(a)-(c). New disclosures are also required after changes in the terms of certain private education loans. 12 C.F.R. § 226.48(b)(4). The Arnetts have not alleged that any of these circumstances are present here. The Arnetts cite *Hubbard v. Fidelity Federal Bank*, 91 F.3d 75, 79 n.7 (9th Cir. 1996), for the proposition that TILA requires ongoing disclosures. *Hubbard*, however, only required ongoing disclosures because the credit extended was an adjustable rate mortgage and the lender was required to send payment adjustment notices.

ongoing notices, however, BOA's flood insurance requirements would still be subject to the exemption provided by 12 C.F.R. § 226.4(d)(2). In the letters that BOA sent to the Arnetts requiring the Arnetts to purchase additional flood insurance, BOA expressly provided that the Arnetts may purchase the insurance from the insurer of their choice. *See* Dkt. 23-1, Ex. 4; 23-2, Ex. 5; 23-3, Ex. 9.[14]

In their briefing, the Arnetts rely on *Travis v. Boulevard Bank N.A.*, 880 F. Supp. 1226 (N.D. Ill. 1995), to argue that TILA requires BOA to issue new disclosures. In *Travis*, the defendant bank and the plaintiffs entered a retail sales installment contract to finance the purchase of a car. *Id.* at 1231. After the consummation of the contract, the bank purchased default insurance and added the amount of the premiums to the plaintiffs' existing debt. *Id.* at 1229. The "Plaintiffs argued that these charges constituted new 'finance charges,' and that these new finance charges constituted a new credit transaction requiring Defendant to make new disclosures" pursuant to TILA. *Id.* The court agreed, holding that "the Defendant's purchase of the allegedly unauthorized insurance and the subsequent addition of the resulting premiums to Plaintiffs' existing indebtedness constituted a new credit transaction." *Id.* Several cases following *Travis* have endorsed that holding. *See, e.g., Begala v. PNC Bank, Ohio, Nat. Ass'n*, 163 F.3d 948, 951 n.1 (6th Cir. 1998) ("*Begala I*") (*Travis* "correctly concluded that the insurance purchase 'and the subsequent addition of the resulting premiums to Plaintiffs' existing

---

[13] "Consummation" means "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13).

[14] These exhibits are copies of the letters sent by BOA to the Arnetts stating that the Arnetts must purchase additional flood insurance. Because these letters are referenced in the Complaint, Compl. ¶¶ 27-29, 32-35, 37, the court may consider them when deciding a Rule 12(c) motion. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("court may . . . consider . . . documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment").

indebtedness constituted a new credit transaction'"); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 599 (E.D. Pa. 2011); *Vician v. Wells Fargo Home Mortg.*, No. 2:05-CV-144, 2006 WL 694740 (N.D. Ind. Mar. 16, 2006).

The Arnetts, however, have failed to allege facts in their Complaint that make *Travis* applicable here. The court in *Travis* found that a new credit transaction had taken place, requiring new TILA disclosures, because the bank had increased the amount of the plaintiffs' debt. *See Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 780 (6th Cir. 2000) ("*Begala II*") (finding that *Travis* required new disclosures because the bank increased the principal amount of the plaintiffs' indebtedness). In this case, the Arnetts have not alleged that BOA added the cost of flood insurance premiums to the Arnetts' outstanding principal on their mortgage loan.[15] *See* Compl. ¶¶ 34, 40, 69-80. The Arnetts' TILA claim is, therefore, dismissed. If the Arnetts can allege that BOA increased the overall amount of the Arnetts' principal, as replead, they may be able to state a TILA claim.

## G.    Real Estate Settlement Procedures Act

RESPA, 12 U.S.C. § 2601 *et seq.*, "regulates the market for real estate 'settlement services,' a term defined by statute to include 'any service provided in connection with a real estate settlement[.]'" *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2037-38 (2012) (quoting 12 U.S.C. 2602(3)). "Among RESPA's consumer-protection provisions is § 2607, which directly furthers Congress's stated goal of 'eliminat[ing] . . . kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.' *Id.* (quoting 12 U.S.C.

---

[15]   Section five of the trust deed permits the lender to add the cost of insurance premiums to the principal. *See* Dkt. 23-1. The Arnetts also allege generally that Defendants added "the cost of force-placed insurances to borrowers' loan balances[.]" Compl. ¶ 49. Notwithstanding this general allegation, however, the Arnetts have not alleged that BOA added the cost of any flood insurance premiums to *their* outstanding principal.

§ 2601(b)(2)). Section 2607(a) makes it unlawful to "accept any fee, kickback, or thing of value pursuant to any agreement . . . that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." Section 2607(b) makes it unlawful to "accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." The Arnetts allege that Defendants violated both subsection (a) and (b) by "receiving fees, kickbacks and/or other things of value in connection with obtaining force-placed insurance from . . . Balboa and/or other affiliated companies" and "accept[ing] portions, splits or percentages of premiums charged for force-placed insurance, without performing actual services." Compl. ¶¶ 87-88.

    BOA argues that the Arnetts' RESPA claim should be dismissed because § 2607 only applies to "real estate settlement services," and BOA's placement of flood insurance occurred more than two years after the Arnetts settled their loan. Defs.'s Mem. at 23-25. The court agrees. "Settlement service means any service provided in connection with a prospective or actual settlement[.]" 24 C.F.R. § 3500.2. Settlement means "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan. This process may also be called 'closing' or 'escrow' in different jurisdictions." *Id.* BOA's placement of flood insurance was performed years after the Arnetts closed on their home loan. RESPA "does not focus on post-settlement fees paid by mortgagors after they have purchased their houses." *Bloom v. Martin*, 77 F.3d 318, 321 (9th Cir. 1996); *Molosky v. Washington Mut., Inc.*,

664 F.3d 109, 118 (6th Cir. 2011) (Section 2607 "does not apply to fees assessed after a

property's settlement"). [16] Accordingly, the Arnetts' RESPA claim is dismissed.

## H.      Oregon's Unlawful Debt Collection Practices Act

The Arnetts assert that BOA violated two subsections of the UDCPA. The first, Or. Rev.

Stat. § 646.639(2)(k) ("subsection (k)"), makes it unlawful for a "debt collector, while collecting

or attempting to collect a debt, . . . [to] [a]ttempt to or threaten to enforce a right or remedy with

knowledge or reason to know that the right or remedy does not exist[.]" The second, Or. Rev.

Stat. § 646.639(2)(n) ("subsection (n)"), makes it unlawful for "a debt collector, while collecting

or attempting to collect a debt, to . . . [c]ollect or attempt to collect any interest or any other

charges or fees in excess of the actual debt unless they are expressly authorized by the agreement

creating the debt or expressly allowed by law."

In *Porter v. Hill*, 314 Or. 86 (1992), the Oregon Supreme Court held that subsection (k)

does not make it unlawful to attempt to collect a debt that does not exist. Instead, subsection (k)

prohibits abusive debt collection methods. *Id.* at 92. In *Hedrick v. Spear*, 138 Or. App. 53, 60

(1995), the Oregon Court of Appeals applied the same holding to subsection (n): As "does

paragraph (k), paragraph (n) assumes the existence or possible existence of the debt and focuses

on a *means* of collection: the adding of unauthorized charges." *Id.* at 61 (emphasis in original).

---

[16] Plaintiffs argue that BOA's placement of flood insurance was a real estate settlement service because a "settlement" occurred when BOA executed the "the force-placed insurance contract." Pls.' Mem. at 38. To make this argument, Plaintiffs cite 24 C.F.R. § 3500.2 and state, in an explanatory parenthetical, that § 3500.2 defines "'settlement' as the 'process of executing legally binding documents regarding a lien on property.'" Pls.' Mem. at 38. If this were the entirety of the definition, Plaintiffs might have advanced a meritorious argument. Plaintiffs, however, fail to include the immediately following sentence in § 3500.2's definition of "settlement": "This process may also be called 'closing' or 'escrow' in different jurisdictions." That sentence makes clear that "settlement" refers to the a specific event commonly understood, in this jurisdiction, as the "closing."

The Oregon legislature's "overall concern in enacting the UCDPA was with the coercive or abusive *methods* often employed to enforce debts, and not with whether the alleged debts actually *exist*." *Steele v. A & B Auto. & Towing Serv., Inc.*, 135 Or. App. 632, 641 (1995) (emphasis in original).

In light of these decisions, the Arnetts fail to state a cognizable claim under either subsection (k) or (n). It appears from the Arnetts' Complaint that the alleged debts are the premiums for additional flood insurance coverage that BOA demanded that the Arnetts purchase.[17] Compl. ¶ 130. The Arnetts assert that BOA violated subsection (k) by threatening to force-place additional insurance when the Arnetts did not, on their own, purchase that additional coverage. Compl. ¶ 131. The Arnetts' assert that BOA violated subsection (n) by collecting "interest, fee, and commission income on the [force-placed] polices." Compl. ¶ 132. The Arnetts' claim fails because it is premised on the existence of the alleged debt, not on the *method* employed to enforce the debt. The Arnetts do not dispute that force-placing insurance is not, by itself, an abusive debt collection method. *See* Pls.' Mem. at 43-44. Rather, they argue that "force-placing insurance *that is not required by contract or law*" is an abusive debt collection method. Pls.' Mem. at 44 (emphasis added). The phrase "is not required by contract or law," however, reveals that the Arnetts' claim is premised on whether the underlying debts—the premiums for additional flood insurance coverage—were permitted by the contract. Because the permissibility of the debt collection method the Arnetts complain of is wholly dependent on the validity of the alleged debt, the Arnetts' claim reduces to a dispute about whether the alleged debt actually

---

[17]  The Arnetts' Complaint fails to state this clearly. In fact, the Complaint does not contain any allegations that identify the alleged debt. This failure alone could warrant dismissing the Arnetts' claim. Because, however, the Arnetts' UDCPA allegations face more fundamental legal deficiencies, the court attempts to clarify the Arnetts' apparent intent so that it may address the fundamental problems.

exists. As *Porter* and its progeny make clear, the UDCPA is not about whether an alleged debt actually exists. The Arnetts' UDCPA claim is, therefore, dismissed.

## CONCLUSION

For the foregoing reasons and to the foregoing extent, Defendants' Motion for Judgment on the Pleadings (Dkt. 25) is **GRANTED IN PART AND DENIED IN PART** as follows: Plaintiffs' Counts I, II, III, V, and VII are dismissed, and Plaintiffs' Counts IV and VI are not dismissed.

IT IS SO ORDERED.

DATED this 11th day of July, 2012.


/s/ Michael H. Simon
Michael H. Simon
United States District Judge