**Timothy S. DeJong,** OSB No. 940662
Email: tdejong@stollberne.com
**Scott A. Shorr,** OSB No. 961873
Email: sshorr@stollberne.com
**Nadine A. Gartner**, OSB No. 103864
Email: ngartner@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

**Shanon J. Carson** (*pro hac vice*)
Email: scarson@bm.net
**Patrick F. Madden** (*pro hac vice*)
Email: pmadden@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:     (215) 875-4656
Facsimile:     (215) 875-4604

**Attorneys For Plaintiffs**
[Additional counsel appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LARRY ARNETT, RONDA ARNETT, ALICE A. BERGER, LEE M. BERGER, SUSAN LASS, MARK LEMMER, PAMELA LEMMER, KARYL RESNICK, ERIC SKANSGAARD, DONNA M. WADE, and EDWARD M. WALLACE, JR., individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br>    v.<br><br>BANK OF AMERICA, N.A., in its own capacity and as successor by merger to BAC HOME LOANS SERVICING, L.P.,<br><br>      Defendant. | Case No. 3:11-CV-01372-SI<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>(Unjust Enrichment; Violation of Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.; Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing; Conversion)<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Page 1 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Larry Arnett, Ronda Arnett, Alice A. Berger, Lee M. Berger, Susan Lass, Mark Lemmer, Pamela Lemmer, Karyl Resnick, Eric Skansgaard, Donna M. Wade, and Edward M. Wallace, Jr. (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned attorneys, bring this class action against Defendant Bank of America, N.A. in its own capacity and as successor by merger to BAC Home Loans Servicing, L.P. ("BoA" or "Defendant").  The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others:

## **<u>INTRODUCTION</u>**

### 1.

Plaintiffs and the members of the Class defined below have mortgage loans[1] secured by residential property and/or shares in housing cooperatives, and were forced to purchase flood insurance by BoA in one or both of the following ways:  (1) BoA force-placed flood insurance (also known as lender-placed flood insurance) on them; or (2) the borrower purchased coverage in excess of their unpaid principal balance or credit line because BoA demanded such insurance and would have force-placed or did force-place such coverage at a significantly higher premium.

### 2.

BoA originates, acquires, and/or services mortgage loans secured by real property, some of which are located in Special Flood Hazard Areas ("SFHAs").  These loans include original purchase-money mortgages secured by the property, second mortgages, mortgage refinances and home equity lines of credit ("HELOCs").

---

[1] The term "mortgage loans" as used herein refers first and second mortgage loans and home equity lines of credit for which a deed of trust and other type of security instruments was executed in connection therewith.

Page 2 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

3.

The terms of all standard mortgage loans require borrowers to purchase and agree to maintain property insurance coverage on the secured property as a condition to funding and to protect the mortgagee's interest in the property.

4.

In order to ensure that the mortgagee's interest in the secured property remains protected, standard mortgage loan provisions also typically allow the lender to "force-place" insurance if and when a homeowner fails to maintain the insurance required by the mortgage.  Any amounts disbursed for the procurement of such insurance are charged to the borrower's escrow account and become additional debt secured by the mortgage.

5.

Under the National Flood Insurance Act ("NFIA"), lenders that extend credit to borrowers secured by a home or other building in an SFHA must ensure that the borrower maintains a minimum amount of flood insurance coverage on the structure "at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act [equal to the replacement cost of improvements up to $250,000 for single family homes], whichever is less."  42 U.S.C. § 4012a(b)(1).

6.

Neither the United States Department of Housing and Urban Development ("HUD") – which promulgates regulations applicable to mortgage loans obtained through the Federal Housing Administration ("FHA"), the Federal National Mortgage Association ("FNMA" or "Fannie Mae"), nor the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie

Page 3 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Mac") (together with Fannie Mae, "GSEs") require borrowers whose loans are located in SFHAs to maintain flood insurance in excess of their unpaid principal balances or credit line.

7.

Specifically, HUD's guides state:

> **Dollar Amount of Flood Insurance Coverage.**  For loans, loan insurance or guarantees, the amount of flood insurance coverage, need not exceed the outstanding principal balance of the loan.

*See* U.S. Department of Housing and Urban Development, "Flood Insurance: HUD Guidance and      Technical      Assistance,"      *available      at* http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm (last visited July 20, 2012); *accord* 24 C.F.R. § 203.16a(c) ("flood insurance must be maintained . . . in an amount at least equal to . . . the outstanding balance of the mortgage").

8.

Similarly, the GSEs provide mortgage servicers with mandatory flood insurance requirements for use in servicing the Fannie/Freddie mortgage portfolios.  *See, e.g.*, https://www.e**fanniemae**.com/sf/guides/ssg/svcg/svc061011.pdf;      *see      also* http://www.allregs.com/tpl/Main.aspx.

9.

The requirements of the NFIA, HUD, and the GSEs were applicable at the time that Plaintiffs and the Class originated their loans.

10.

Despite these requirements, BoA instituted a policy during the class period that mandated that borrowers insure their homes located in SFHAs to the lesser of the full replacement value of their homes or $250,000 – doing away with the third prong of the NFIA, HUD and GSE

Page 4 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

requirements that would permit a borrower to insure to the unpaid principal balance or credit line amount. By unilaterally changing the flood insurance coverage requirement, BoA forced some borrowers, *i.e.*, those whose unpaid balance was less than $250,000 and the replacement cost of their home, to purchase excess flood insurance coverage. If those borrowers did not purchase the demanded insurance, BoA would force-place a policy that provided the demanded coverage.

11.

This policy unfairly and materially changed the terms of the loan agreements between borrowers and their lender. Exacerbating the unfairness inherent in BoA's policy, BoA was often only the servicer of the loans (and not the lender, note holder, or current owner of the loan). Thus, BoA lacked any real interest in the underlying property. Moreover, as servicer, BoA lacked authority to change the flood insurance requirements established at the time of origination (or to demand flood insurance that exceeded the requirements of the current owner of the loan, often Fannie Mae or Freddie Mac, whose requirements for flood insurance during the class period were consistent with federal law).

12.

There is no reasonable or good faith explanation for BoA demanding that class members secure flood insurance on their properties over and above the lender's or note holder's security interest in the properties.

13.

When borrowers were force-placed by BoA, regardless whether the forced placement occurred due to the excessive coverage requirement, BoA also unfairly profited because BoA received kickbacks in the form of commissions and discounted services, and/or other compensation for itself and its affiliates in connection with the policies.

Page 5 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

14.

BoA's force-placed insurance program was operated in coordination with QBE First Insurance Agency ("QBE First")[2] and its predecessor entities Balboa Insurance Group ("BIG"), Balboa Insurance Company ("BIC") and Newport Management Corporation ("NMC") (collectively "Balboa") and involved various other BoA entities including but not limited to Banc of America Insurance Services, Inc. ("BAISI") and non-BoA entities including but not limited to Southwest Business Corporation ("SWBC"), Lexington Insurance Company ("Lexington"), Illinois Union Insurance Company ("Illinois Union") and Lloyd's of London ("Lloyds").

15.

During the class period, BoA had agreements with, or owned, force-placed insurers and insurance service providers.  Pursuant to these agreements and ownership structures, BoA had its loan servicing portfolio automatically tracked to ensure that each borrower whose property was in an SFHA had flood insurance that met BoA's requirements.  When the tracking entity determined that such insurance was not maintained, a letter cycle commenced whereby letters were generated and sent to the borrower demanding proof of acceptable insurance.  If the borrower failed to provide proof of acceptable insurance, a force-placed policy was obtained for the borrower from an insurer with whom BoA had an agreement and the premium was charged

---

[2] QBE First Insurance Agency, Inc. is a California corporation with its principal place of business in Atlanta, Georgia.  In 2011, QBE purchased the lender placed insurance program and portfolio of Balboa Insurance Group, including the lender placed insurance program of BoA. Balboa Insurance Group and its subsidiaries, Balboa Insurance Company and Newport Management Company, operated BoA's force-placed flood insurance program until the sale to QBE.  After that sale, QBE has taken over BoA's force-placed insurance program.  QBE First performs numerous services related to its role in tracking properties for BoA's lender-placed insurance program.

Page 6 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

to the borrower.  Pursuant to BoA's agreements, various entities affiliated with BoA received a percentage of the premiums charged to borrowers.

16.

BoA has the power and exerts that power to force borrowers to pay for the excessive, unnecessary and unauthorized force-placed flood insurance at exorbitant premiums because BoA can simply withdraw the amounts from borrowers' escrow accounts, add the amounts to the loan balance, and ultimately foreclose on the property should the borrower fail to pay the inflated force-placed premiums.  When BoA force-places one of these excessively-priced, unwarranted flood insurance policies and assesses the cost on the borrower through these methods, it can lead to the imposition of various fees in addition to the force-placed premiums, including late fees, while also creating a negative credit reporting situation for the borrower and may ultimately lead to loan modification or foreclosure, which creates for BoA the opportunity to generate even more servicer fee income.

17.

There is no reasonable or good faith explanation for BOA to profit from these kickbacks received in connection with force-placed insurance.

18.

BoA has systematically violated the legal rights of Plaintiffs and the Class in two fundamental respects:  (1) Plaintiffs were required to purchase excessive and unwarranted amounts of flood insurance by BoA ("Excess Coverage Claims"); and (2) BoA received improper kickbacks in the form of commissions and other compensation from its force-placed flood insurance vendors ("Kickback Claims").

Page 7 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

19.

BoA engaged in this conduct in bad faith, knowing that its actions were contrary to applicable law, reasonable commercial standards of fair dealing, and the reasonable expectations of borrowers upon entering into their mortgage agreements.

20.

Based on Defendant's conduct as described herein, Plaintiffs assert claims for:

a.  Unjust Enrichment;

b.  Violation of the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

c.  Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing; and

d.  Conversion.

21.

Plaintiffs seek monetary, injunctive and declaratory relief, penalties and attorneys' fees and costs on behalf of themselves and the Class.

## **PARTIES**

22.

Plaintiffs Larry Arnett and Ronda Arnett are married residents of Roseburg, Oregon and own real property there.  They have a mortgage loan that is currently serviced by BoA and is secured by their Roseburg property.

23.

Plaintiff Eric Skansgaard is a resident of Carson City, Nevada and owns property in Hoquiam, Washington.  He has a mortgage loan that is currently serviced by BoA and is secured by his Hoquiam property.

Page 8 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

24.

Plaintiff Susan Lass is a resident of Rehoboth, Massachusetts and owns real property there.  She has a mortgage loan that was serviced by BoA at all relevant times and was secured by her Rehoboth property.

25.

Plaintiffs Lee M. Berger and Alice Berger are residents of the Village of Buzzard's Bay in the Town of Bourne, Massachusetts.  At all relevant times, the Bergers' mortgage was serviced by BoA and is secured by their Buzzard's Bay property.

26.

Plaintiff Donna M. Wade is a resident of Quincy, Massachusetts in the county of Norfolk, Massachusetts.  At all relevant times, Ms. Wade's mortgage was serviced by BoA and secured by her Quincy property.

27.

Plaintiffs Pamela Lemmer and Mark Lemmer are residents of Centreville, Virginia and they own shares in a housing cooperative located in Norfolk, Virginia (the "Housing Cooperative").  In connection with their ownership of their shares of the Housing Cooperative, they are entitled to occupy unit number C4.  The Lemmers have a mortgage loan serviced by BoA that is secured by their shares in the Housing Cooperative.

28.

Plaintiff Edward M. Wallace, Jr. is a resident of Portland, Oregon.  At all relevant times, Mr. Wallace had a HELOC that was serviced by BoA and secured by his Portland property.

Page 9 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

29.

Plaintiff Karyl Resnick ("Resnick") is a resident of Winthrop, Massachusetts.  At all relevant times, Ms. Resnick had a HELOC that was serviced by BoA and secured by her Winthrop property.

30.

Defendant Bank of America, N.A. ("BoA") is a national bank association headquartered in Charlotte, North Carolina.  BoA does business in Oregon, Washington, Massachusetts, North Carolina and throughout the United States.   As part of that business, BoA holds and services mortgage loans secured by real property and shares in housing cooperatives.   BoA is the successor by merger of other loan servicers including BAC Home Loans Servicing, L.P., and Countrywide Financial Corporation.

## JURISDICTION AND VENUE

31.

This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the federal Truth in Lending Act, 12 U.S.C. § 1601, *et seq.* ("TILA").

32.

This Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367.

33.

Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act ("CAFA") because the matter in controversy in this action exceeds $5,000,000.00, exclusive of

Page 10 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

interest and costs, Plaintiffs and Defendant are citizens of different states, and there are more than 100 members of the class.

34.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the acts, events and/or omissions giving rise to this action took place in this District.  The Arnett Plaintiffs and Plaintiff Edward Wallace as well as many members of the Class reside in Oregon, and BoA regularly conducts business in Oregon.

**FACTUAL ALLEGATIONS**

A.      **Flood Insurance Coverage Requirements for Mortgages**

35.

The NFIA requires lenders to ensure that flood insurance coverage is maintained on any improved property securing a loan within a SFHA.  Under the NFIA, the amount of coverage must be at least equal to the *lesser* of:  (1) the maximum insurance coverage available through the NFIP, which is $250,000; (2) the outstanding balance of the loan; or (3) the replacement cost of the property.  *See* 42 U.S.C. § 4012a(b)(1).

36.

The HUD Secretary, who sets flood insurance requirements for FHA loans, similarly states that flood insurance coverage on such loans need not exceed the outstanding principal balance of the loan.  *See*, *e.g.*, http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm (last visited July 20, 2012) ("Dollar Amount of Flood Insurance Coverage.  For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan."); *accord*, 24 C.F.R. § 203.16a(c) ("flood insurance must be maintained . . . in an amount at

Page 11 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

least equal to . . . the outstanding balance of the mortgage"). BoA is required to abide by the HUD Secretary's flood insurance requirements for FHA loans and not to instead impose its own requirements to benefit itself.

37.

The standard security instrument for FHA loans (the "FHA Deed") provides, in the property insurance provision, that "[b]orrower(s) shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of Housing and Urban Development]." This statement unambiguously provides that the HUD Secretary's flood insurance requirements, not BoA's, control.

38.

Similarly, Fannie Mae and Freddie Mac provide the banks they engage to service their mortgage portfolios with guidelines on Fannie Mae's and Freddie Mac's flood insurance requirements. *See* https://www.efanniemae.com/sf/guides/ssg/svcg/svc061011.pdf; *see also* http://www.allregs.com/tpl/Main.aspx. These Fannie/Freddie guidelines are satisfied if the borrower maintains flood insurance coverage equal to the federal requirements. BoA, as loan servicer, is obligated to abide by Fannie Mae's and Freddie Mac's guidelines for loan servicing on loans owned by those entities and not to instead impose its own requirements to benefit itself.

39.

The standard security instrument for Fannie Mae and Freddie Mac loans (the "Fannie Deed") vests the right to set and change flood insurance requirements in those entities (or other applicable loan investors, *i.e.*, the lenders), not the loan servicer. The Fannie Deed further limits

Page 12 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

the ability to force-place flood insurance to situations where the lender is not protected by the borrower's preferred policy.[3]

40.

Loan servicers profit from servicing loans by extracting additional payments for themselves or their affiliates, that are over and above the principal and interest payments that they receive for servicing the loan.  Since servicers are already paid for servicing, these kickbacks or "commissions" paid to servicers and their affiliates on force-placed insurance are pure profit.  Moreover, if the practices of the servicer lead to default or modification of the loan, the servicer can collect even more payments and/or fees, including late fees and modification fees, while being fully protected from any loss of principal on the loan, since that risk is fully borne by the owner or guarantor of the loan, *i.e.*, the lender.

41.

Thus, without ownership of the underlying loans, BoA suffers no consequences if its force-placed flood insurance scheme forces borrowers into foreclosure because that loss is borne by the owner of the loans.

42.

BoA is without contractual discretion to set flood insurance coverage requirements on loans for which it is merely the loan servicer.  Instead, BoA is bound to enforce the requirements of federal law and the lender/owner of the loans that it services.

43.

BoA has engaged in a scheme to generate additional fees and income for itself and its affiliates by requiring borrowers whose loans it services to purchase additional flood insurance in

---

[3] Similarly, the language in other common form contracts does not permit BoA to change flood insurance requirements.

Page 13 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

excess of the requirements under the NFIA, the mortgage agreements, HUD, and the Fannie Mae/Freddie Mac guidelines.  Through this practice, BoA generated significant profits for itself and its affiliates through, *inter alia*, commissions, kickbacks, and in-kind payments and other fees.

44.

The additional flood insurance coverage that BoA force places is excessive and unnecessary, particularly where the outstanding balance on the mortgage is less than the purported replacement value of the property

45.

BoA misrepresents to its loan servicing customers that federal law and/or the customers' loan contracts require BoA to obtain flood insurance in the amounts dictated by BoA.  Neither the loan contracts nor federal law require flood insurance coverage in excess of a borrower's unpaid principal balance.

**B.**    **BoA Improperly Received Kickbacks in Connection with Its Force-Placed Insurance Program**

46.

Although mortgage loan agreements typically permit the lender or loan servicer to force-place insurance when adequate insurance is not in place, the lender or loan servicer's discretion in setting up its force-placed insurance program to invoke the provision is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself.

47.

In an effort to reap profits from Plaintiffs and the Class, BoA has routinely exceeded the bounds of reasonableness and the spirit, intent, and letter of the mortgage loan contracts by force-placing insurance in a manner and in amounts that are not required to protect the lender's

Page 14 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

interest in the property, and which are neither required nor contemplated by the mortgage contracts.

48.

Specifically, Plaintiffs' and the Class' mortgage loan contracts, which are standardized mortgage contracts, do not permit the lender or loan servicer to receive a financial benefit in connection with force-placed insurance policies.  Instead, the contracts only allow costs that are reasonable and necessary to protect the lender's interest in the secured property to be passed on to the borrower.

49.

Force-placed insurance policies are almost always more expensive than standard insurance coverage.  Reportedly, such policies cost up to ten times more than standard policies. While the FPI policy is for the benefit of the lender, the cost is passed on to the borrower.  Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the force-placed coverage should be cancelled and premiums should be fully or partially refunded.

50.

The forced placement of insurance policies can be a very lucrative business for loan servicers.  Commonly, the loan servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit from the provider.  The financial benefits typically, and as is the case here, take the form of reduced cost services such as insurance tracking services and unearned commissions.

Page 15 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

51.

Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to an affiliate posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the loan servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider. These "commissions" conferred a benefit on the Defendant that was not authorized by Plaintiffs' mortgage agreements.

52.

Loan servicers, including BoA, also do not perform their own insurance tracking. Instead, BoA and other loan servicers contract with the insurer or the insurer's affiliate to perform the tracking services at a reduced cost. In BoA's case, prior to 2011, BoA's tracking functions were performed by BoA's own affiliate which was owned by BoA's affiliated insurance company. The reduction in the cost of the services is made up by the company as part of the FPI charges to borrowers.

53.

Indeed, during his testimony before the Property and Casualty Insurance and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims – an organization that claims to have been "Bridging the Lending and Insurance Communities, since 1992" – recognized that FPI premiums include not just the risk incurred, but also "administrative costs undertaken by the LPI carrier on the lenders' behalf, that are bundled into the costs of the premium" which in turn are passed on

Page 16 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

to "the general public."  *See* Joseph Markowicz, PRP Claims, NAIC Testimony (Aug. 9, 2012).[4]

Thus, in return for purchasing higher-priced FPI, insurers provide kickbacks to lenders in the

form of services, the cost of which is ultimately borne by the mortgagee.

54.

Illustrative of the typical kickback arrangements is the following graphic from American

Banker:



/ / / /

/ / / /

/ / / /

/ / / /

---

[4] *Available at*
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance
_testimony_markowicz.pdf (last visited June 19, 2013).

Page 17 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

55.

J. Robert Hunter, who is the Director of Insurance at the Consumer Federation of America, described these practices in his testimony before the New York Financial Services Department ("NYDFS") in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker[s] or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers.  Lenders often receive free or below cost service from affiliated service providers.[5]

As Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance, testified: that "[s]ervicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer."[6]  Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

56.

As J. Robert Hunter in his testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI

---

[5] *See* Testimony of J. Robert Hunter, Director of Insurance, Before the NYDFS on Force-Placed Insurance in New York (May 17, 2012) at 1,
*available at* http://www.dfs.ny.gov/insurance/hearing/fp_052012/Hunter_written_testimony.pdf (last visited June 19, 2013) ("Hunter NYDFS Testimony").

[6] *See* Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, Public Hearing on Force-Placed Insurance before the NYDFS (May 21, 2012) at 15, *available at* http://www.dfs.ny.gov/insurance/hearing/fp_052012/fp_trans_20120521.pdf (last visited June 19, 2013) ("Birnbaum NYDFS Testimony").

Page 18 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

insurers, since no sales force is required to place the insurance." *See* Hunter NYDFS Testimony at 5. The lack of individual underwriting does not result in lower prices for consumers; quite the contrary, actually. Instead, as a result of the schemes described herein between the insurers and servicers, consumers are gouged.

57.

Fannie Mae has also changed its policies to curb bank and servicers' improper practices. First, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance. In its RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners." In particular, Fannie Mae made the following observations:

(a)     "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

(b)     "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

(c)     "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See* Fannie Mae Request For Proposal dated March 6, 2012.

58.

Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to

Page 19 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at *3*.

59.

On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds.  *See* Fannie Mae Servicing Guide Announcement SVC-2012-04.   The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by Defendant) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id*. at 4.

60.

On March 26, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance.  This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks."   *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions.

Page 20 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

61.

The FHFA prohibits:

> Certain Sales Commissions. The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

62.

The FHFA acknowledged:

> (d)  "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id.* at 2.

> (e)  "[T]he multiples involved may not reflect claims experience..." *Id.*

> (f)  "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id.*

> (g)  "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations. Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other compensation paid to servicers by carriers. In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id.* at 3.

63.

BoA, in particular, made its decision to force-place flood insurance together with its affiliate Balboa and other insurance affiliates until Balboa sold its force-placed insurance business to QBE in 2011. BoA's arrangement with QBE stemmed from that sale and is governed by contracts executed contemporaneously therewith.

Page 21 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

64.

Both before and after Balboa's sale of its force-placed insurance business, BoA unfairly profited from the forced placement of flood insurance on Plaintiffs and the Class. BoA's affiliates charge excessively high insurance premiums above what an independent insurance company would charge, even though those insurance policies are, as described in BoA's letters to Plaintiffs, limited compared with independently written insurance policies.

65.

BoA paid a reduced-cost fee to its affiliate Newport Management Corporation ("NMC") to monitor BoA's loan servicing portfolio for insurance that met BoA's requirement. When a lack of such insurance was detected, BoA commenced a letter cycle that demanded evidence of acceptable insurance. If the borrower failed to provide evidence of insurance that met BoA's requirements, the cycle culminated in a force-placed insurance policy being issued and charged to the borrower.

66.

This process was highly automated. NMC would issue an order for force-placed insurance policies in a nightly batch. NMC would order the policies through a surplus lines broker which would, in turn, obtain the policy from a carrier. The surplus lines broker was also an affiliate of BoA until Balboa sold its force-placed business to QBE. Both NMC and the surplus lines broker took commissions on the force-placed policies. At times, an additional commission was paid to BoA's affiliated insurance agency, Banc of America Insurance Services, Inc. ("BAISI").

Page 22 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

67.

When Balboa sold off the force-placed insurance business to QBE, BoA entered into exclusive agreements with QBE to run BoA's force-placed insurance program. Pursuant to the agreements, BoA continued to receive reduced-cost insurance tracking services. The agreements also provided for BoA to continue to receive a share of profits attributable to the force-placed insurance business sold to QBE.

68.

BoA has engaged in the above practices in order to realize unfair financial gains from Class members, including Plaintiffs. By adding the cost of force-placed insurance to borrowers' loan balances, BoA earns additional interest on the amounts charged, and causes borrowers to incur additional costs and fees. By purchasing force-placed insurance from its subsidiary Balboa and other insurance affiliates, BoA also earned commissions for Balboa and its other insurance affiliates, and ultimately realized the entire profit on the transaction.

**C.    BOA Has Force-Placed Plaintiffs and Class Members Into Unnecessary and Inflated Flood Insurance**

### 1. History of the Arnetts' Mortgage Loan

69.

In July 2008, Plaintiffs Larry Arnett and Ronda Arnett obtained a mortgage loan in the amount of $135,000.00 from KeyBank National Association ("KeyBank") on a residential property in Roseburg, Oregon.

70.

As a condition precedent to obtaining this mortgage loan from KeyBank, the Arnetts were required to obtain flood insurance coverage at least equal to the lesser of: (1) the unpaid principal balance, (2) the replacement value of the improvements; or (3) $250,000.

Page 23 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

71.

Consistent with the mortgage agreement and federal law, the Arnetts obtained (and have maintained at all relevant times) flood insurance coverage in the amount of $250,000 at the time the loan was originated through the Hartford Insurance Company.  KeyBank never indicated that this amount was in any way inadequate under federal law or the Arnetts' mortgage.  In addition, the Arnetts also maintained an excess flood insurance policy in the amount of $203,000 through Lloyd's of London.  The Arnetts also maintained a separate and independent flood insurance policy in the amount of $27,500 on their out-building/garage.

72.

In or about November 2008, the Arnetts were notified that the servicing of their mortgage was transferred to Countrywide Bank, FSP.  The mortgage was subsequently transferred from Countrywide Bank to BOA (when BOA acquired Countrywide).  The Arnetts continued to make payments to BoA under the terms and conditions originally agreed upon with KeyBank, including escrow payments.

73.

On or about September 14, 2010, BoA commenced a letter cycle during which time BoA sent a letter to the Arnetts stating that the Arnetts' flood insurance coverage was "not adequate" and that additional coverage in the amount of $87,280.00 was required.  The September 14, 2010 letter further stated that "to maintain acceptable insurance, we require that you maintain flood insurance coverage in an amount at least equal to the lesser of:  (1) the maximum insurance available under the NFIP for participating communities, which is currently $250,000; or (2) the replacement value of the improvements to your Property."

Page 24 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

74.

In response to the cycle letters, the Arnetts provided BoA with proof of their flood insurance.  Notwithstanding that Plaintiffs had adequate flood insurance, BoA dunned the Arnetts' escrow account for unnecessary flood insurance.

75.

After the Arnetts repeatedly contacted BoA, the premium for that force-placed policy was refunded to the Arnetts' escrow account.

76.

On or about June 16, 2011, BoA sent another letter to the Arnetts stating that "[o]ur records indicate that you currently have no flood insurance coverage" and that coverage in the amount of $250,000.00 is required at an approximate cost of $2,448.00 (for an annual premium).

77.

The Arnetts again provided proof of the current adequate insurance.  Notwithstanding that the Arnetts had adequate flood insurance in place and even repeatedly provided proof of that fact to BoA, BoA force-placed an additional $250,000 flood insurance policy on the Arnetts' property through its affiliates, and charged the Arnetts' escrow account $2,448.00 for that coverage as an annual premium.

78.

After the Arnetts repeatedly contacted BoA, the premium for that force-placed policy was refunded to the Arnetts' escrow account.

79.

Contemporaneously with the June 16, 2011 cycle letters, BoA also commenced a cycle letter process concerning flood insurance on the Arnett's garage.  Although the Arnetts

Page 25 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

maintained a flood insurance policy for $27,500 on the garage, BoA demanded that the coverage be raised to $50,000.  When the Arnetts did not increase their coverage, BoA forced-placed an additional flood policy for Plaintiffs' garage through its affiliates at an additional annual cost of $114.75, which BOA extracted from Plaintiffs' escrow account.

80.

After the Arnetts repeatedly contacted BoA unsuccessfully seeking to have the premium for their garage policy refunded, the Arnetts contacted their insurance carrier and increased their own coverage to $50,000.  BoA refunded a prorated portion of the $114.75 but refused to refund the remaining premium.

81.

Throughout this ordeal, despite the excessive insurance coverage and the cost of that coverage, the Arnetts have continued to pay their mortgage payments to avoid foreclosure over this dispute.

### 2.  History of the Skansgaard Mortgage Loan

82.

In October 2002, Plaintiff Eric Skansgaard obtained an FHA loan from Eagle Home Mortgage in the amount of $83,686, secured by a deed of trust on his property in Hoquiam, Washington.  BoA later acquired the rights to this loan and is the current servicer of the loan.

83.

As a condition precedent to obtaining this mortgage loan from Eagle Home Mortgage, Skansgaard was required to obtain flood insurance coverage at least equal to the lesser of: (1) the unpaid principal balance, (2) the replacement value of the improvements; or (3) $250,000.

Page 26 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

84.

Consistent with the mortgage agreement and federal law, at closing and for several years thereafter, Skansgaard maintained flood insurance on his Hoquiam property in an amount sufficient to cover his principal balance in accordance with federal law and his mortgage agreement.

85.

In March 2010, after acquiring Skansgaard's loan, BoA commenced a cycle letter process asserting that Skansgaard's flood insurance coverage was not adequate.  The letters claimed Skansgaard was required to maintain flood coverage at least equal to the lesser of (1) the maximum insurance available under the National Flood Insurance Program ($250,000); or (2) the replacement value of the improvements to the property.

86.

In April 2010, BoA force-placed a flood insurance policy on Skansgaard's property to satisfy its unjustified flood insurance requirement.  BoA charged Skansgaard's escrow account $799.22 for this coverage which was purchased through BoA's affiliates.

87.

In December 2010, BoA sent Skansgaard a notice that threatened to renew the force-placed insurance policy for another term at his expense.  In February 2011, BoA renewed the force-placed policy providing $192,000 in coverage at a cost of $985.18.

/ / / /

/ / / /

/ / / /

/ / / /

Page 27 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

### 3.  History of the Lass Mortgage Loan

88.

On February 18, 1994, Plaintiff Susan Lass obtained a mortgage loan from Residential Mortgage Corporation in the amount of $40,000, secured by her home in Rehoboth, Massachusetts.  BoA later acquired the servicing rights to her mortgage.

89.

As a condition precedent to obtaining this mortgage loan, Lass was required to obtain flood insurance coverage at least equal to the lesser of: (1) the unpaid principal balance, (2) the replacement value of the improvements; or (3) $250,000.

90.

Consistent with the mortgage agreement and federal law, Lass obtained and continuously maintained at all relevant times sufficient flood insurance to cover her unpaid principal balance. In 2007, Lass voluntarily elected to increase her coverage to $100,000, greatly exceeding the amount required by her mortgage agreement and federal law.

91.

Shortly after BoA acquired the servicing rights to Lass's mortgage, in November 2009, BoA commenced a letter cycle asserting her flood insurance coverage was not adequate. According to the form letters, Lass was required to increase her flood insurance coverage by $145,086 (from $100,000 to more than $245,000) in order to meet BoA's requirement that the flood insurance coverage be at least equal to the lesser of (1) the maximum insurance available under the National Flood Insurance Program ($250,000); or (2) the replacement value of the improvements to the property.

Page 28 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

92.

In January 2010, BoA informed Lass that it had force-placed a flood insurance policy on her property in the amount of $145,086, and indicated that the cost of the policy was $748.10 and would be charged to her.

93.

In September 2010, BoA notified Lass that it would be renewing her force-placed insurance policy.  In November 2010, BoA followed through on that threat, purchasing a new force-placed insurance policy providing $149,998 of coverage at a cost of $779.94.

94.

In March 2011, BoA sent Lass a letter indicating that it had purchased yet another force-placed flood insurance for her property in the amount of $139,988, at a cost of $724.94.  This flood insurance policy replaced the earlier policy referenced in the November 2010 letter.

95.

Lass' experience with Bank of America was the subject of an investigative news report by WBZTV in Boston.  *See* http://boston.cbslocal.com/2011/03/07/bank-of-america-faces-flood-insurance-complaints/ (last visited April 2, 2014).  After this investigative report aired, BoA refunded the first two flood insurance policies that it purchased for her property, but never refunded the third policy.

**4.  History of the Bergers' Mortgage Loan**

96.

On August 18, 2003, Plaintiffs Lee M. Berger and Alice Berger obtained a mortgage loan from Fleet National Bank in the amount of $130,000 that was secured by their property in

Page 29 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Buzzard's Bay, Massachusetts.  BoA subsequently acquired the servicing rights to the Berger's

mortgage when Fleet National Bank was acquired by and merged into BoA.

The Bergers' form mortgage provided as follows:

> **Hazard and Flood Insurance** Borrower shall keep the improvement now
> existing or hereafter erected on the Property insured against loss by fire, hazards
> included within the term "extended coverage" and such other hazards as Lender
> may require, and in such amounts as and for such periods as Lender may require.
> Borrower shall maintain coverage in an amount equal to the smallest of: (a) the
> amount of any obligation having priority over this Mortgage, plus one hundred
> ten percent (110%) of the unpaid balance of principal and interest on the Note; or
> (b) the maximum insurable value of the Property, but in no event shall such
> amount be less than the amount necessary to satisfy any co-insurance requirement
> contained in the insurance policy; or (c) the maximum amount permitted by
> applicable law. If the Property is located in an area identified by federal officials
> as having special flood hazards and where flood insurance is available under the
> National Flood Insurance Act, Borrower will keep Property insured against loss
> by flood.

97.

At all times relevant hereto, the Bergers maintained $143,000 in flood insurance coverage

on the property, which was substantially greater than 110% of the outstanding balance on the

Loan and hence was substantially greater than the amount of flood insurance coverage that the

Bergers were contractually obligated to maintain on their property pursuant to their form

mortgage agreement.

98.

In May 2010, BoA commenced a letter cycle asserting that the Bergers had not provided

proof of acceptable flood insurance.  According to the form letters, the Bergers were required to

increase their flood insurance coverage by $107,000 (from $143,000 to $250,000) in order to

meet BoA's requirement that the flood insurance coverage be at least equal to the lesser of (1)

the maximum insurance available under the National Flood Insurance Program ($250,000); or

(2) the replacement value of the improvements to the property.

Page 30 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

99.

On several occasions, the Bergers sent BoA proof that they were maintaining flood insurance coverage of $143,000, which was substantially greater than was required by their mortgage agreement.

100.

In July 2010, BoA force-placed a flood insurance policy with $107,000 of coverage and deducted the $280.88 premium from the Bergers' escrow account.

### 5.  History of Wade's Mortgage Loan

101.

Ms. Wade had the same form mortgage form as the Bergers, requiring her to maintain flood insurance coverage "in an amount equal to the smallest of: (a) the amount of any obligation having priority over this Mortgage, plus one hundred ten percent (110%) of the unpaid balance of principal and interest on the Note; or (b) the maximum insurable value of the Property, but in no event shall such amount be less than the amount necessary to satisfy any co-insurance requirement contained in the insurance policy; or (c) the maximum amount permitted by applicable law."

102.

As of December 10, 2010, the outstanding balance owed by Ms. Wade on her mortgage loan was $61,378.76.  Accordingly, Ms. Wade was required under the Mortgage Agreement to maintain $67,516.64 ($61,378.76 x 110% = $67,516.64) of flood insurance coverage (since that amount is less than the maximum amount available under the National Flood Insurance Act).

Page 31 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

103.

At all times relevant, Ms. Wade maintained $83,000 in flood insurance coverage on her property, which was greater than 110% of the outstanding balance on her loan and hence was greater than the amount of flood insurance coverage that Ms. Wade was contractually obligated to maintain on the Property pursuant to her form mortgage agreement.

104.

In August 2010, BoA commenced a letter cycle asserting that Ms. Wade had not provided proof of acceptable flood insurance.  According to the form letters, she was required to obtain an additional $90,000 of flood insurance for her property.  While not explained in the letter, it is clear that BoA arrived at the $90,000 figure because Ms. Wade carried hazard insurance of $173,000 ($83,000 + $90,000 = $173,000).

105.

In August 2010, Ms. Wade wrote to BoA and confirmed again that she maintained flood insurance coverage of $83,000 on her property. Ms. Wade also enclosed the page from her mortgage agreement that sets forth the relevant insurance requirement and explained that the flood insurance coverage she already had in place was sufficient pursuant to the mortgage agreement.  Instead of addressing Ms. Wade's concerns, BoA continued it automated letter cycle, continuing to demand that Ms. Wade purchase $90,000 of additional flood insurance and culminated in the force-placement of an additional $90,000 in flood insurance coverage, the establishment of an escrow account on Ms. Wade's behalf, and the charging of $236.25 to her escrow account  for the force-placed flood insurance.

Page 32 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

106.

Based upon BoA's misrepresentations, and in order to avoid further charges for force-placed flood insurance, Ms. Wade subsequently purchased $90,000 of additional flood insurance coverage through Fidelity National Property & Casualty Insurance Company.  The additional coverage through Fidelity went into effect on October 18, 2010.  BoA subsequently refunded a portion of the premium it charged Ms. Wade for the force-placed flood insurance ($186.40). However, it did not refund the balance of the premium ($49.85). Ms. Wade paid this amount in full.

107.

Based upon BoA's misrepresentations, and in order to avoid further charges for force-placed flood insurance, Ms. Wade subsequently purchased $90,000 of additional flood insurance coverage through Fidelity National Property & Casualty Insurance Company.  The additional coverage through Fidelity went into effect on October 18, 2010.  BoA subsequently refunded a portion of the premium it charged Ms. Wade for the force-placed flood insurance ($186.40). However, it did not refund the balance of the premium ($49.85). Ms. Wade paid this amount in full.

108.

Ms. Wade's mortgage loan continues to be owned and serviced by BoA.

### 6.   History of the Lemmers' Mortgage Loan

109.

Pamela and Mark Lemmer reside in a housing cooperative located in Norfolk, Virginia.

Page 33 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

110.

On May 5, 2008, the Lemmers received a loan from BoA in the amount of $93,500, which they used to purchase shares in the housing cooperative.  In connection with this loan, they signed a Loan Security Agreement covering their 215 shares (out of a total 3,520 outstanding shares issued to various shareholders).

111.

BoA did not require the Lemmers to obtain flood insurance on their cooperative unit as a condition precedent to closing on the loan, and their loan agreement was silent on the topic of flood insurance.

112.

However, in November 2009, BoA commenced a letter cycle asserting that the Lemmers had not provided proof of acceptable flood insurance.  The letters asserted that the Lemmers were required by their mortgage and/or federal law to purchase flood insurance coverage for their cooperative unit that they occupied in the amount of $93,500.

113.

Neither the Lemmers' mortgage contract (which is silent on the issue) nor federal law require the purchase of flood insurance for the Lemmers' cooperative unit.[7]

---

[7] *See* Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers, Regarding Flood Insurance, Fed. Reg. 35,914 at 35,943 (July 21, 2009), available at http://edocket.access.gpo.gov/2009/pdf/E9-17129.pdf. *Accord*, National Flood Insurance Manual at GR 7 (October 1, 2011), available at http://www.fema.gov/business/nfip/manual.shtm (listing "Cooperative Unit within Cooperative Building" as an "ineligible risk").  The only flood insurance available for cooperatives under the NFIP is coverage for an entire building. Such coverage must be procured in the name of the cooperative, not the individual shareholders in the cooperative, like the Lemmers. *Id.* at GR 6.

Page 34 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

114.

Despite the fact that neither the mortgage agreement nor federal law required the Lemmers' to purchase flood insurance, and in light of BoA's threatening letters, the Lemmers purchased a flood insurance policy that provided $93,500 of coverage and carried a premium in excess of $500. The following year, the Lemmers renewed that policy, incurring a premium of $564 to cover the period of November 24, 2010 to November 24, 2011.

115.

Even though the Lemmers followed BoA's instructions, in April 2011, BoA commenced a letter cycle demanding an additional $76,694 in flood insurance coverage on the Lemmers' cooperative unit. Because the Lemmers did not obtain this additional, excessive coverage, BoA force-placed a policy on them. For unexplained reasons, BoA then cancelled the policy and replaced it with a policy which provided $92,262 of flood insurance coverage and assessed the $484 premium to the Lemmers.

116.

In November 2011, the Lemmers elected not to renew their own flood insurance coverage (which they were compelled to purchase by BoA's original letter cycle). In response, BoA force-placed a flood insurance policy providing $185,762 of coverage and charged the $1,795 premium to the Lemmers' escrow account.

**7. History of Wallace's Mortgage Loan**

117.

In 1999, Plaintiff Wallace purchased his home, located in Portland, Oregon, with the aid of a $100,000 loan secured by this property. Wallace refinanced his home with BoA on April 8, 2003.

Page 35 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

118.

On October 31, 2006, Wallace obtained a HELOC from BoA with a maximum available credit limit of $10,000.  To secure this line of credit, Wallace signed an "Oregon HELOC Deed of Trust" which, in addition to pledging his residence as collateral, required Wallace, among other things, to maintain property insurance "in the amounts (including deductible levels) and for the periods that Lender requires."

119.

At the time the HELOC Deed was signed, Wallace was also presented with (and asked to sign) a "Flood Insurance Notification Letter" informing Wallace that, because his credit line was secured by his residence, and because this residence was situated within an SFHA, he would be required to maintain flood insurance on his property in amounts equal to the lesser of:

- 100% of the insurance value of the improvements as established by the property insurer (also known as the replacement value by insurance companies); or

- The maximum limit of coverage made available under the National Flood Insurance Program (NFIP) or from a private insurer (whichever applies); or

- The total home equity loan or line amount plus all other mortgages.

*See also* 42 U.S.C. § 4012a(b)(1) (limiting necessary flood insurance to amounts "at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act, whichever is less."); *Hofstetter v. Chase Home Fin., LLC*, No. 10-1313, 2010 WL 3259773, at *7-10 (N.D. Cal. Aug. 16, 2010) (where credit lines are concerned, flood insurance need only cover the maximum amount of that line (assuming it is the lesser of replacement value and NFIP maximum coverage)).

Page 36 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

120.

This Letter, having been presented alongside and signed contemporaneously with the

remaining documents constituting the HELOC agreement, was both integrated and incorporated

into that agreement by reference (the Letter is listed as included within the HELOC closing

package by the Home Equity Closing Instructions provided to Wallace at the time the loan was

originated).

121.

The HELOC Deed also stated that BOA could alter the insurance requirements at

anytime, and was authorized to force-place insurance on Wallace's behalf should he fail to meet

these requirements.  This power is limited. The Office of the Comptroller of the Currency

("OCC"), in collaboration with the Federal Deposit Insurance Corporation ("FDIC"), the Office

of Thrift Supervision ("OTS"), the National Credit Union Administration ("NCUA"), and the

Board of Governors of the Federal Reserve System ("FRB"), has limited the amount of flood

insurance that may be force-placed on property securing a HELOC to "the total amount of the

line, the value of the improved property or the maximum amount of flood insurance coverage

available, whichever is less." Comptroller's Handbook: Flood Disaster Protection, May 1999, pg.

6; see also 12 CFR § 22.3 (limiting force-placement to the lesser of loan-balance or maximum

coverage under the NFIA).

122.

At the time the HELOC was originated, given Wallace's preexisting mortgage and the

amount of flood insurance already maintained on his property, Wallace was not required to

purchase any additional coverage.

Page 37 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

123.

Payments on any balance owed under the HELOC were withdrawn directly from Wallace's checking account by BoA.

124.

In October 2011, Wallace extinguished all of his home loan debt with the exception of the $10,000 HELOC (of which less than $8,500 was outstanding) by paying off his non-HELOC mortgage debt.

125.

Following the satisfaction of his mortgage, Wallace canceled his then-current flood insurance policy.  Wallace received no notification from Defendant that it would, in fact, still require him to maintain such insurance (as is necessary under the NFIA (42 U.S.C. § 4012a(e)(1))); nor, accordingly, was Wallace afforded a 45-day window within which to purchase such insurance (as is also required by the NFIA (42 U.S.C. § 4012a(e)(2))).  Instead, on April 26, 2012, Wallace noticed an abnormal withdrawal of $688.80 from his checking account. After contacting Defendant, Wallace was informed that the bank had force-placed flood insurance on his behalf, in an amount of $151,400: an amount that is over 15 times Wallace's HELOC credit limit of $10,000.00, and is nearly 20 times the amount outstanding on the HELOC. Under applicable law and regulations, Defendant can only force-place flood insurance up to the HELOC's credit limit, which is lower than the replacement value of the Wallace's home.

126.

Despite Defendant's clear violation of law, Wallace, on May 3, 2012, again contacted BoA, this time to explain that, while willing to insure himself against the $8,604.71 he still owed

Page 38 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendant on his HELOC, (which had been closed to further borrowing for roughly a year), he was unwilling to pay the premiums on an unnecessary and excessive $150,000 flood insurance policy.  Defendant, however, took no action to reduce the amounts of forced insurance on Wallace's home.

127.

Defendant's sole interest in Wallace's property is the $10,000 HELOC.  Federal law and regulations restrict the amount that can be force-placed on a HELOC, which here would be at most the HELOC's credit limit.  Defendant's force placement of $140,000-worth of excessive flood insurance is contrary to the prohibitions of the OCC, the insurance requirements delineated in Wallace's Flood Insurance Notification Letter, and federal requirements under the NFIA.

128.

Moreover, the HELOC Deed does not provide Defendant with unlimited power to force Wallace to purchase excessive and unnecessary flood insurance.  Rather that power is limited by the Flood Insurance Notification Letter and federal law.  Moreover, to the extent that Defendant had any discretion to alter this requirement (and it does not), that discretion is limited by the implied covenant of good faith and fair dealing. Defendant's force-placement of flood insurance that is 15 times the amount permitted and required by federal law breaches the parties' contract and is done in bad faith in order to receive exorbitant kickbacks and commissions.

### 8.  History of Resnick's Mortgage Loan

129.

On April 14, 2005, Plaintiff Resnick entered into a HELOC agreement with "Fleet National Bank, a Bank of America Company."  BoA is the lender-in-interest to this HELOC

Page 39 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

agreement, and services the HELOC.  Resnick's maximum available credit under her HELOC is $75,000.

130.

Resnick's HELOC is secured by her property in Winthrop, Massachusetts.  Resnick does not have any other mortgages or liens on the property.

131.

Resnick's home is located in a SFHA.  Accordingly, federal law requires flood insurance on the house for the duration of her HELOC agreement, in an amount equal to "the total amount of the line, the value of the improved property or the maximum amount of flood insurance coverage available, whichever is less."  Hofstetter, No. 10-1313, 2010 WL 3259773, at *7-10 (N.D. Cal. Aug. 16, 2010); accord, Hofstetter, 2010 WL 4606478, at *9-10 (Oct. 29, 2010).

132.

Consistent with this federal mandate, BoA required Resnick to maintain $75,000 of flood insurance coverage upon opening the HELOC, and Resnick did so.  This amount of flood insurance coverage fully satisfied federal flood insurance requirements, fulfilled Resnick's coverage requirements under the terms of her mortgage loan and fully protected BoA's interest in her property.  The pertinent provision of Resnick's mortgage loan contract provides:

> 4.       Hazard and Flood Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require, and in such amounts and for such periods as Lender may require. Borrower shall maintain coverage in an amount equal to the smallest of:  (a) the amount of any obligation having priority over this Mortgage, plus the Maximum Principal Sum; or (b) the maximum insurable value of the Property …; or (c) such amount as may be required by applicable law.  If the Property is located in a [SFHA] and where flood insurance is available under the [NFIA], Borrower will keep Property insured against loss by flood.

Page 40 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

133.

Resnick has continuously maintained flood insurance on her property in an amount sufficient to cover her maximum available credit and satisfy applicable law and the terms of her mortgage loan.  However, on or about May 3, 2010, BoA sent Resnick an "Insurance Deficiency Notice."

134.

The following month, on or about June 14, 2010, BoA sent Resnick another notice ("Notice of Flood Insurance Coverage").  In this Notice, BoA acknowledged that Resnick already had a flood insurance policy in place on the property but stated:

> After a comparison of the amount of flood insurance on the current policy to the replacement cost value of the most recent hazard policy on file, we have determined that additional flood insurance coverage is required….

> To maintain acceptable insurance, we require that you maintain flood insurance coverage in an amount at least equal to the lesser of: (1) the maximum insurance available under the NFIP for participating communities, which is currently $250,000; or (2) the replacement value of the improvements to your property (typically based on the amount of hazard insurance we understand you have purchased for the property).

135.

This Notice of Flood Insurance Coverage further stated that BoA had purchased additional flood insurance coverage for Resnick's property in the amount of $175,000 (bringing her total coverage amount to $250,000), and indicated that BoA would charge her $459.16 for the cost of this additional insurance.  In this letter, BoA also noted that "our licensed affiliate insurance agency may have received a commission for placing this insurance."

136.

BoA had no legitimate basis for force-placing this additional flood insurance coverage on Resnick's property, at her expense.  Although BoA asserted in the Notice of Flood Insurance

Page 41 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Coverage that "additional flood insurance is required[,]" the additional insurance that it

purchased was not required under federal law or the terms of Resnick's mortgage loan, and BoA

was not authorized to force-place this additional insurance.

## CLASS ACTION ALLEGATIONS

### 137.

Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class:

> All persons who were sent a flood insurance cycle letter by BANA, Countrywide
> Home Loans, Inc., or Countrywide Home Loans Servicing, LP or who were
> charged for lender-placed flood insurance by BANA, Countrywide Home Loans,
> Inc., or Countrywide Home Loans Servicing, LP on or after January 1, 2007 and
> before April 4, 2014 in connection with a residential mortgage loan, home equity
> line of credit, reverse mortgage loan, or loan secured by shares in a cooperative
> housing association (the "Class").

### 138.

The Class is composed of hundreds of thousands of mortgage loan borrowers, the joinder

of which in one action would be impracticable.  The disposition of the claims of the proposed

Class members through this class action will benefit the parties and the Court.  The identities of

individual members of the proposed Classes are readily ascertainable through BoA's account

records.

### 139.

Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs, like all Class

members, received a flood insurance cycle letter from BoA and were charged for force-placed

insurance and/or required to obtain additional flood insurance not required by their form

mortgage agreements and/or federal law.  Plaintiffs and all members of the Class suffered

Page 42 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

damages in the form of costs associated with the purchase and maintenance of these high-premium policies.

140.

Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained experienced counsel with the necessary expertise and resources to prosecute a nationwide consumer class action. Plaintiffs and their counsel do not foresee any circumstances where the interests of Plaintiffs would be adverse to those of the Class.

141.

Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. Questions of law and fact common to the Class include, without limitation:

(a) whether BoA has a policy and practice of misrepresenting to their customers that federal law requires additional flood insurance on mortgages for which such additional flood insurance is not required by law;

(b) whether BoA's standard flood insurance letters are false, misleading and/or deceptive;

(c) Whether Bank of America breached its form contracts with borrowers, by arranging for commissions for itself or its affiliates on lender-placed flood insurance;

(d) Whether Bank of America breached its form contracts with borrowers by demanding that Plaintiffs and the Class Members maintain unnecessary and/or excessive amounts of flood insurance;

Page 43 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

(e) Whether BoA breached the implied covenant of good faith and fair dealing by (1) arranging for commissions for itself or its affiliates; and (2) requiring that Plaintiffs and the Class Members maintain unnecessary and/or excessive amounts of flood insurance;

(f) whether BoA violated the TILA by requiring unnecessary and/or excessive amounts of flood insurance;

(g) Whether BoA was unjustly enriched by the practices described herein; and

(h) Whether BoA wrongfully converted customers' escrow funds by engaging in the practices described herein; and.

(i) the proper measure of damages.

142.

All members of the Class have suffered damages as a result of a "common wrong" on the part of BoA. Damages are ascertainable by reference to BoA's records concerning the members of the Class.

143.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy. It would be economically impractical for Plaintiffs and members of the Class to pursue individual actions against BoA as the costs of prosecution would likely surpass their individual damages. BoA continues to engage in the unlawful, unfair and unconscionable conduct that is the subject of this Complaint. Class treatment of Plaintiffs' claims will permit Plaintiffs and the Class to vindicate their rights against BoA and conserve the resources of the Court and the Parties. Class treatment would also avoid the possibility of inconsistent outcomes that could result from a multitude of individual actions in varying jurisdictions nationwide.

Page 44 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## CAUSES OF ACTION

### COUNT I
### Unjust Enrichment

144.

Plaintiffs restate and incorporate the preceding paragraphs of the Complaint.

145.

BoA received from Plaintiffs and members of the proposed Class benefits in the form of overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overcharging and overreaching.  BOA and/or its affiliates receive a commission or other compensation in obtaining these policies.

146.

BoA knew that the charges for these policies were excessive and not the result of good faith practices, and BoA and/or its affiliates profited from commissions and other compensation made possible by these overcharges.

147.

As a result, Plaintiffs and the Class have conferred a benefit on BoA, and BoA has knowledge of this benefit.  BoA has voluntarily accepted and retained the benefit conferred on it.

148.

BoA will be unjustly enriched if it is allowed to retain the benefit, and each Class member is entitled to and demands an award against BoA for the amount that it enriched BoA and for which BoA was unjustly enriched.

/ / / /

/ / / /

/ / / /

Page 45 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## COUNT II
### Violation of TILA, 15 U.S.C. § 1601, *et seq.*

149.

Plaintiffs restate and incorporate the preceding paragraphs of this Complaint.

150.

Congress's objective in passing the TILA was to ensure that the true cost of goods and services be fully and completely disclosed to the consumer in writing prior to the consumer's purchase and agreement to those terms.

151.

Residential mortgage loan agreements and line of credit agreements are subject to the disclosure requirements of TILA and all related regulations, commentary and interpretive guidance promulgated by the Federal Reserve Board.

152.

BoA is a "creditor" as defined by TILA.

153.

TILA requires BoA to timely disclose all finance charges, other charges and third-party charges that may be imposed in connection with a mortgage loan.

154.

TILA requires BoA to make these disclosures clearly and conspicuously.

155.

TILA requires BoA to accurately and fully disclose the terms of the legal obligation between the parties.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

156.

BoA violated TILA by, *inter alia*: (i) adversely changing the terms of mortgage loans after origination without consent and demanding more insurance than previously required in amounts greater than necessary to protect their interest in the property; and (ii) failing to provide proper notice, after origination, that BoA was amending the terms of loans as described in the relevant mortgage documents.

157.

BoA systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Class.

158.

Plaintiffs and the Class have been injured and have suffered monetary losses as a result of BoA's violations of TILA.

159.

As a result of these TILA violations, Plaintiffs and the Class are entitled to recover actual damages and attorneys' fees and costs to be paid by BoA, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT III
### Breach of Contract/Breach of Implied Covenant of Good Faith and Fair Dealing

160.

Plaintiffs restate and incorporate the preceding paragraphs of the Complaint.

161.

Plaintiffs' mortgage contracts were serviced by BoA.

162.

Page 47 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

With the exception of the Lemmers (whose mortgage contract was silent as to flood insurance), Plaintiffs' original mortgage contracts required that flood insurance be maintained as a condition of closing and maintaining the loan.

163.

BoA breached its contracts with Plaintiffs and the Class by requiring payment for additional and excessive flood insurance that was not required under their form mortgage contracts.

164.

BoA also breached its contracts with Plaintiffs and the Class by receiving and/or arranging for reduced-cost tracking services, unearned commissions, and other compensation in return for permitting insurance carriers to charge exorbitant rates that would be reimbursed by Plaintiffs and the Class.

165.

Additionally, the law implies into every contract an obligation of good faith and fair dealing, the purpose of which is to prevent one party's conduct under the contract from impeding the other party's performance of that contract.

166.

BoA's actions as described herein constitute a breach of its duty of good faith and fair dealing.  To the extent that BoA had any discretion under the contract, it exercised that authority in bad faith by requiring excessive and unnecessary amounts of flood insurance coverage and by accepting and or arranging for reduced-cost tracking services, unearned commissions, and other compensation in connection with force-placed flood insurance, at the expense of Plaintiffs and the Class.

Page 48 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

167.

BoA engaged in this conduct as part of a scheme to wrongfully increase income for itself and its affiliates.

168.

Plaintiffs and the Class are entitled to compensatory damages resulting from BoA's wrongful actions in breach of their mortgage contracts and in violation of BoA's obligation of good faith and fair dealing in performing under the contracts.

## COUNT IV
### Conversion

169.

Plaintiffs restate and incorporate the preceding paragraphs of the Complaint.

170.

BoA had and continues to have a duty to maintain and preserve its customers' mortgage accounts and mortgage escrow accounts, and to prevent their diminishment or alteration through its own wrongful acts.

171.

BoA wrongfully and intentionally collected insurance premiums from customers' mortgage escrow accounts or added such payments to their customers' unpaid balances.

172.

BoA collected these premiums by wrongfully and intentionally taking specific and readily identifiable funds from mortgage customers' escrow accounts or misappropriating funds paid toward their unpaid balances.

Page 49 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

173.

BoA has assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiffs and the Class without legal justification.

174.

BoA retains these funds unlawfully without consent of Plaintiffs and the members of the Class and deprives them from exercising control over the funds.

175.

BoA intends to permanently deprive Plaintiffs and the Class of these funds.

176.

Plaintiffs and the Class properly own these funds, not BoA, who now claims an ownership interest in such funds contrary to the rights of Plaintiffs and the Class.

177.

Plaintiffs and the Class are entitled to the immediate possession of these funds.

178.

BoA has wrongfully converted these specific and readily identifiable funds.

179.

BoA's wrongful conduct is of a continuing nature.

180.

As a direct and proximate result of BoA's wrongful conversion, Plaintiffs and the Class have suffered and continue to suffer actual damages.  Plaintiffs and the Class are entitled to recover from BoA all damages and costs permitted by law, including all amounts that BoA has wrongfully converted, which are specific and readily identifiable.

Page 50 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows:

A.      That this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3), that Plaintiffs be appointed as the representatives for the Class, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.      That Plaintiffs and the Class recover the damages determined to have been sustained by them with any applicable civil penalties, statutory damages and punitive damages, and that judgment be entered against BoA on behalf of Plaintiffs and each member of the Class;

C.      That BoA, its subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees and all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from engaging in the unlawful conduct alleged in this Complaint;

D.      That Plaintiffs and members of the Class be awarded prejudgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

E.      That Plaintiffs and the Class recover their costs of this suit, including attorneys' fees and costs, as provided by law; and

F.      That the Court grant such further relief that it deems just and appropriate.

/ / / /

/ / / /

/ / / /

/ / / /

Page 51 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all claims so triable.

DATED this 7th day of April, 2014.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: s/Timothy S. DeJong
     **Timothy S. DeJong**, OSB No. 940662
     **Scott A. Shorr**, OSB No. 961873
     **Nadine A. Gartner**, OSB No. 103864

209 SW Oak Street, 5th Floor
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email:       tdejong@stollberne.com
              sshorr@stollberne.com
              ngartner@stollberne.com

-And-

**Eric L. Cramer** (admitted *pro hac vice*)
Email: ecramer@bm.net
**Shanon J. Carson** (admitted *pro hac vice*)
Email: scarson@bm.net
**Patrick F. Madden** (admitted *pro hac vice*)
Email: pmadden@bm.net
**Lawrence Deutsch** (admitted *pro hac vice*)
Email: ldeutsch@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:    (215) 875-4656
Facsimile:    (215) 875-4604

-And-

**Brett Cebulash** (admitted *pro hac vice*)
Email: bcebulash@tcllaw.com
**Kevin S. Landau** (admitted *pro hac vice*)
Email: klandau@tcllaw.com
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone:    (212) 931-0704
Facsimile:    (212) 931-0703

Page 52 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

-And-

**E. Michelle Drake** (admitted *pro hac vice*)
Email: drake@nka.com
**Kai Richter** (admitted *pro hac vice*)
Email: krichter@nka.com
NICHOLS KASTER, PLLP
80 South Eighth Street
Minneapolis, MN 55402
Telephone:    (612) 256-3200
Facsimile:  (612) 215-6870

-And-

**Edward F. Haber** (admitted *pro hac vice*)
Email: ehaber@shulaw.com
**Adam M. Stewart**(admitted *pro hac vice*)
Email: astewart@shulaw.com
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA  02109
Phone: 617-439-3939
Facsimile: 617-439-0134

**Attorneys for Plaintiffs**

Page 53 – CONSOLIDATED AMENDED CLASS ACTION COMPLAINT