**Timothy S. DeJong,** OSB No. 940662
Email: tdejong@stollberne.com
**Scott A. Shorr,** OSB No. 961873
Email: sshorr@stollberne.com
**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:  (503) 227-1600
Facsimile:  (503) 227-6840

**Kai Richter** (Admitted *Pro Hac Vice*)
Email: krichter@nka.com
**E. Michelle Drake** (Admitted *Pro Hac Vice*)
Email: drake@nka.com
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South 8th Street
Minneapolis, MN  55402
Telephone:  (612) 256-3200
Facsimile:  (612) 338-4878

**Attorneys for Plaintiffs (***additional counsel on signature page***)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| LARRY ARNETT, RONDA ARNETT, ALICE A. BERGER, LEE M. BERGER, SUSAN LASS, MARK LEMMER, PAMELA LEMMER, KARYL RESNICK, ERIC SKANSGAARD, DONNA M. WADE, and EDWARD M. WALLACE, JR., individually and on behalf of all others similarly situated, | Case No. 3:11-CV-01372-SI |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM OF LAW IN SUPPORT** |
| v. | **(UNOPPOSED BY DEFENDANT)** |
| BANK OF AMERICA, N.A. in its own capacity and as successor by merger to BAC HOME LOANS SERVICING, L.P., | |
| Defendant. | |

# MOTION

Plaintiffs Larry Arnett, Ronda Arnett, Alice A. Berger, Lee M. Berger, Susan Lass, Mark Lemmer, Pamela Lemmer, Karyl Resnick, Eric Skansgaard, Donna M. Wade, and Edward M. Wallace, Jr. (collectively, "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully move this Court to enter an Order granting final approval of the parties' Class Action Settlement Agreement and Release ("Settlement Agreement" or "Agreement") in this consolidated action. This motion is based on the points and authorities cited in Plaintiffs' accompanying Memorandum of Law; the contemporaneously-filed Declarations of Kai Richter, Richards Simmons (on behalf of the Claims Administrator), and Arthur Olsen; the arguments of counsel; and all files, records and proceedings in this matter. This Motion is supported by Defendant Bank of America, N.A. ("BoA" or "BANA"), in its own capacity and as successor by merger to BAC Home Loans Servicing, L.P.

Dated: August 26, 2014

NICHOLS KASTER, PLLP

By: ___/s/ Kai Richter_____
**E. Michelle Drake** (admitted *pro hac vice*)
Email: drake@nka.com
**Kai Richter** (admitted *pro hac vice*)
Email: krichter@nka.com
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870

**Timothy S. DeJong**, OSB No. 940662
Email: tdejong@stollberne.com
**Scott A. Shorr**, OSB No. 961873
Email: sshorr@stollberne.com
**Nadine A. Gartner**, OSB No. 103864
Email: ngartner@stollberne.com
STOLL STOLL BERNE LOKTING &
     SHLACHTER P.C.
2500 SW Oak Street, Suite 500
Portland, OR  97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

**Shanon J. Carson** (admitted *pro hac vice*)
Email: scarson@bm.net
**Patrick F. Madden** (admitted *pro hac vice*)
Email: pmadden@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604

**Brett Cebulash** (admitted *pro hac vice*)
Email: bcebulash@tcllaw.com
**Kevin S. Landau** (admitted *pro hac vice*)
Email: klandau@tcllaw.com
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Facsimile: (212) 931-0703

**Edward F. Haber** (admitted *pro hac vice*)
Email: ehaber@shulaw.com
**Adam M. Stewart**(admitted *pro hac vice*)
Email: astewart@shulaw.com
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, MA  02210
Phone: (617) 439-3939
Facsimile: (617) 439-0134

***ATTORNEYS FOR PLAINTIFFS AND THE SETTLEMENT CLASS***

# MEMORANDUM OF LAW

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ........................................................................................... 1

    A.  Notice of Settlement ............................................................................ 3

    B.  Response From The Settlement Class .................................................. 4

    C.  Relief to Be Provided After the Settlement Becomes Effective .......... 5

        1.  Monetary Relief .......................................................................... 5

        2.  Prospective Relief ....................................................................... 8

III.  ARGUMENT ................................................................................................ 9

    A.  Standard of Review on Motion for Final Approval ............................. 9

    B.  The Settlement Warrants Final Approval ........................................... 10

        1.  The Amount of Relief Provided by the Settlement Is Significant ........... 11

        2.  The Relief Is Reasonable in Light of the Strengths and Weaknesses of the Claims, and Risks, Expense, Complexity, and Duration of Further Litigation ........................................................................ 12

            a.  Litigation Risks ............................................................... 12

            b.  Class Certification Risks .................................................. 14

            c.  Expense, Complexity, and Duration of Further Litigation ........ 15

        3.  The Settlement Comes at an Appropriate Stage, After Exhaustive Discovery ....................................................................... 16

        4.  The Experience and Views of Counsel Support Approval of the Settlement ............................................................................. 16

        5.  The Reaction of the Class to the Settlement Is Overwhelmingly Positive .................................................................................. 17

6.      The Views of the Government Also Support Approving the Settlement ... 18

C.      The Objections to the Settlement are Meritless and Should Be Overruled ... 18

1.      The Hannas' Objections Are Meritless ... 19

      a.      Plaintiffs Have Provided Sufficient Information Regarding the Value of the Claims ... 20

      b.      Plaintiffs Have Provided Sufficient Information Regarding the Calculation of the Monetary Recovery ... 23

      c.      Calculation of Individual Recovery After Final Approval is Permissible ... 25

2.      The Hall Objections, Prepared With the Assistance of a Professional Objector, Are Meritless ... 27

      a.      Attorney Bandas Is a Professional Objector ... 27

      b.      The Halls' Objections Are Meritless ... 28

3.      The Vitales' Objections Are Meritless ... 31

4.      The Neumann Objections Are Meritless ... 33

IV.      CONCLUSION ... 35

## TABLE OF AUTHORITIES

<u>Cases</u>

*Brand v. Nat'l Bank of Commerce*, 213 F.3d 636 (5th Cir. 2000) ........................... 14

*Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025 (N.D. Cal. 2013) ........................... 13

*Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255 (N.D.N.Y. 2013) ........................... 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531 (N.D. Cal. 2012) ........................... 27, 28

*In re Checking Account Overdraft Litig.*, 830 F.R.D. 1330 (S.D. Fla. 2011) ........................... 12, 19

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ........................... 12

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ........................... 9

*Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) ........................... 12

*Decambaliza v. QBE Holdings, Inc.*, 2013 WL 5777294 (W.D. Wis. Oct. 25, 2013) ........................... 12

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ........................... 30

*Dickerson v. Cable Commc'ns, Inc.*, 2013 WL 6178460 (D. Or. Nov. 25, 2013) ........................... 9-10

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980) ........................... 17

*Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063 (N.D. Cal. 2012) ........................... 13

*Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953 (N.D. Cal. June 13, 2014) ........................... 14

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. June 2, 2014) ........................... 25, 26

*Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014) ........................... 13

*In re Gen. Elec. Co. Sec. Litig.*, 2014 WL 534970 (S.D.N.Y. Feb. 11, 2014) ........................... 27-28

*Gooden v. Suntrust Mortg.*, 2013 WL 6499250 (E.D. Cal. Dec. 11, 2013) ........................... 14

*Gordon v. Chase Home Fin., LLC*, 2013 WL 436445 (M.D. Fla. Feb. 5, 2013) ........................... 14

*Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529 (C.D. Cal. 2013) ........................... 14

*Hall v. Midland Group*, 2000 WL 1725238 (E.D. Pa. Nov. 20, 2000) ........................... 14

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) .................................................. 10

*Hofstetter v. Chase Home Fin., LLC,* 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) ............. 14

*Hofstetter v. Chase Home Finance, LLC,* 2011 WL 5415073 (N.D. Cal. Nov. 8, 2011) ........... 20

*Horton v. Metropolitan Life Ins. Co.,* No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21395 (M.D. Fla. Oct. 25, 1994) ...................................................................................... 15

*Hughes v. Microsoft Corp.,* 2001 WL 34089697 (W.D. Wash. 2001) .............................. 1, 17

*In re Hydroxycut Marketing and Sales Practices Litig.,* 2013 WL 5275618 (S.D. Cal. Sept. 17, 2013) ......................................................................................................... 27

*Johnson v. Brennan,* 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) .................................. 12

*Kolbe v. BAC Home Loans Servicing, L.P.,* 2011 WL 3665394 (D. Mass. Aug. 18, 2011) ........ 13

*Kolbe v. BAC Home Loans Servicing, L.P.,* 695 F.3d 111 (1st Cir. 2012) ............................ 14

*Kolbe v. BAC Home Loans Serv., LP,* 738 F.3d 432 (1st Cir. 2013) ............................ 13, 14

*Kunzelmann v. Wells Fargo Bank, N.A.,* 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ............ 14

*Lacroix v. U.S. Bank, N.A.,* 2012 WL 2357602 (D. Minn. June 19, 2013) ............................ 13

*Laguna v. Coverall N. Am., Inc.,* 753 F.3d 918 (9th Cir. 2014) ...................................... 11

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012) ................................................. 21

*Lane v. Wells Fargo Bank, N.A.,* 2013 WL 269133 (N.D. Cal. Jan. 24, 2013) ...................... 13

*Lane v. Wells Fargo Bank, N.A.,* 2013 WL 3187410 (N.D. Cal. June 21, 2013) .................... 14

*Larson v. AT & T Mobility LLC,* 687 F.3d 109 (3d Cir. 2012) ....................................... 31

*Larson v. Sprint Nextel Corp.,* 2010 WL 234934 (D.N.J. Jan. 15, 2010) ............................ 31

*Lass v. Bank of America, N.A.,* 695 F.3d 129 (1st Cir. Sept. 21, 2012) ............................ 13

*Leghorn v. Wells Fargo Bank, N.A.,* 950 F. Supp. 2d 1093 (N.D. Cal. 2013) ...................... 13

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234 (9th Cir. 1998) ................................... 11

*In re LivingSocial Mktg. & Sales Practices Litig.,* 2013 WL 1181489 (D.D.C. Mar. 22, 2013) .. 28

vii

*Marshall v. Holiday Magic, Inc.*, 550 F .2d 1173 (9th Cir. 1977) .................................. 17-18, 23, 24

*McKenzie v. Wells Fargo Bank, N.A.*, 2012 WL 5372120 (N.D. Cal. Oct. 30, 2012) .................. 13

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928 (N.D. Cal. 2012) ...... 13

*Medearis v. Oregon Teamster Employers Trust*, 2009 WL 1788183 (D. Or. June 19, 2009) ...... 16

*Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504 (E.D. Pa. 2012) ........................ 13

*Morris v. Wells Fargo Bank N.A.*, 2012 WL 3929805 (W.D. Pa. Sept. 7, 2012) ...................... 13

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ............ 10, 17

*Newbridge Networks Sec. Litig.,* 1998 WL 765724 (D.D.C. Oct. 23, 1998) ............................ 12

*Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615 (9th Cir. 1982) .............................. 10

*Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537 (W.D. Wash. 2009) ...................................... 10

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) .................... 11

*Robinson v. Countrywide Credit Indus.*, 1997 WL 634502 (E.D. Pa. Oct. 8, 1997) .................. 14

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) .............................. 23, 24, 29

*Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683 (S.D. Fla. 2014) ........................ 26

*Simpkins v Wells Fargo Bank, N.A.*, 2013 WL 4510166 (S.D. Ill. Aug 26, 2013) .................... 13

*Singleton v. Wells Fargo Bank, N.A.*, 2013 WL 5423917 (N.D. Miss. Sept. 26, 2013) .............. 12

*Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301 (9th Cir.1990) .................... 29

*Skansgaard v. Bank of Am., N.A.*, 896 F. Supp. 2d 944 (W.D. Wash. 2011) ........................ 13

*Sullivan v. DB Investments, Inc.*, 2008 WL 8747721 (D.N.J. May 22, 2008) ........................ 32

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ........................................ 15

*In re Synocor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008) .............................................. 10

*Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370 (9th Cir.1993) .............................. 10, 23, 25

*Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005) .................................. 35

*In re Wal-Mart Wage and Hour Employment Practices Litig.*, 2010 WL 786513 (D. Nev. Mar. 8, 2010) ................................................................................................................28

*White v. Experian Information Solutions, Inc.*, 803 F. Supp. 2d 1086 (C.D. Cal. 2011) .............11

*White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993) ...............................15, 17

*Williams v. Wells Fargo Bank, N.A.*, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ...................13

*Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665 (S.D. Fla. 2012) ...............................14-15

*Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586 (E.D. Pa. 2011) ......................................13

Federal Rules & Regulations

12 C.F.R. § 1024.17 ......................................................................................................35

7B Fed. Prac. & Proc. Civ. § 1797.1 (3d ed. 2005) ............................................................31

Fed. R. Civ. P. 23 ....................................................................................................9, 19

Other Authority

Bruce Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's Law Rev. 949 (2010) ..............................................................19

John E. Lopatka, D. Brooks Smith, *Class Action Professional Objectors: What To Do About Them?*, 39 Fla. St. U. L. Rev. 865 (2012) ........................................................................19

Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers Regarding Flood Insurance, Fed. Reg. 35,914 (July 21, 2009) ............................................................9

Newberg on Class Actions § 11:41 (4th ed. 2006) ...............................................................9

## I.    <u>INTRODUCTION</u>

On April 17, 2014, the Court preliminarily approved the parties' Settlement Agreement,[1] which provides $31 million in monetary relief plus extensive prospective relief to the Settlement Class.  *ECF No. 243.*  The Court found on a preliminary basis that "the terms of the Settlement Agreement (including the monetary relief, prospective relief, and release of claims) are fair, reasonable, and adequate," and approved distribution of notice to the Class.  *Id.*, *¶¶ 9, 10.*  The response from Settlement Class members to the Notice of Settlement ("Class Notice") confirms that the Court's preliminary analysis was correct.  Out of 663,192 Settlement Class members who were sent a notice by U.S. mail, there were only four objections to the Settlement,[2] representing less than ***one thousandth of one percent*** (0.0006%) of all Class members. Moreover, there were only 99 timely opt-outs, representing just over one hundredth of one percent of all Class members (0.015%).  This constitutes overwhelming evidence that the Settlement is fair, reasonable and adequate.  *See Hughes v. Microsoft Corp.*, 2001 WL 34089697, at *8 (W.D. Wash. 2001) (finding "overwhelming[] support" for settlement involving 37,000 class members where there were only 9 objections and 86 opt-outs).  As discussed below, the few objections that have been raised are meritless.  Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

## II.    <u>BACKGROUND</u>

The relevant facts relating to this motion, and the negotiation and terms of the Settlement, were addressed in Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Class

---

[1] The Settlement Agreement is filed at ECF No. 237-1.

[2] One additional objection (from counsel for Class Member Henry Clay Adkins) was filed to Plaintiffs' Motion for Approval of Attorneys' Fees and Expenses, which has been addressed separately in Plaintiffs' Reply Brief in support of that motion.  That Objector, however, does not "object to the gross settlement of $31,000,000 or the settlement's terms."  *ECF No. 259 at 4 n. 6.*

Action Settlement ("Preliminary Approval Memo"). *See ECF No. 228.* Among other things,

Plaintiffs addressed:

- The allegations and history of this action and the other actions pursued by Plaintiffs prior to filing their Consolidated Amended Complaint ("CAC")[3] (*id. at 5-6*);

- The extensive discovery by Plaintiffs before reaching the Settlement (*id. at 6-7*);

- The mediation process with Professor Eric Green (*id. at 7*);

- The scope of the Settlement Class (*id. at 8*);

- The amount of the monetary recovery and the methodology for calculating each Class Member's Settlement Shares (*id. at 8-9*);

- The significant prospective relief available to Settlement Class members under the Settlement, and the opportunity that eligible Settlement Class members will have to reduce their flood insurance coverage requirement (*id. at 9-11*);

- The limited scope of the release, which is narrowly-tailored to flood insurance-related claims (*id. at 12-13*);

- The contents of the Class Notice, and the plan for providing notice via first-class mail (*id. at 11-12*);

- The compensation that may be awarded to Class Counsel and the named Class Representatives under the Settlement (*id. at 13*); and

- The qualifications of Class Counsel and their extensive experience handling other lender-placed insurance ("LPI") matters (*id. at 29-30*).

Plaintiffs incorporate that background here, as well as the background in Plaintiffs' Motion for

Approval of Attorneys' Fees and Expenses (ECF No. 246), and provide the Court with the

---

[3] Prior to filing their Preliminary Approval Motion, Plaintiffs Larry and Ronda Arnett filed a CAC joining the other Plaintiffs who are parties to the Settlement Agreement and who were previously prosecuting class actions against BoA related to lender-placed flood insurance and flood insurance requirements, including: *Berger, et al. v. Bank of America, N.A., et al.*, No. 10-cv-11583 (D. Mass.); *Skansgaard v. Bank of America, N.A., et al.*, No. 2:11-cv-988 (W.D. Wash.); *Lass v. Bank of America, N.A., et al.*, No. 1:11-cv-10570 (D. Mass.); *Wallace v. Bank of America, N.A., et al.*, No. 3:12-cv-935 (D. Or.); *Resnick v. Bank of America, N.A., et al.*, No. 12-cv-10231 (D. Mass.); and *Lemmer v. Bank of America, N.A., et al.*, No. 3:12-cv-00242 (W.D.N.C.). Class Counsel also represented the plaintiffs in *Kolbe v. BAC Home Loans Servicing, L.P*, No. 1:11-cv-10312-NMG (D. Mass.). *See ECF No. 228 at 5-6.*

following additional facts relating to events that have taken place since the Court issued its Preliminary Approval Order, and which are scheduled to take place if final approval is granted.

## A.  <u>Notice of Settlement</u>

Pursuant to Paragraph 14 of the Preliminary Approval Order, the Settlement Administrator, Analytics, LLC ("Administrator"), sent the Court-approved Class Notice and Claim Form to each Settlement Class member on June 12, 2014 via first-class mail.  *Simmons Decl., ¶ 7.*  In total, 663,192 Settlement Notices and claim forms were sent to Settlement Class members in this mailing.  *Id.*[4]

These Notices provided Class Members with all required information relating to the Settlement, including, without limitation: (1) a summary of the lawsuit and the claims asserted; (2) a clear definition of the Settlement Class; (3) a description of the material terms of the Settlement; (4) an explanation as to which Class Members must submit a claim and instructions as to how they may do so; (5) a disclosure of the release of claims should they choose to remain in the Class; (6) an explanation of Class Members' opt-out rights, a date by which Class Members must opt out, and information regarding how to do so; (7) instructions as to how to object to the Settlement and a date by which Class Members must object; (8) the date, time, and location of the Final Approval Hearing; (9) the internet address for the settlement website and the toll-free number from which Class Members could obtain additional information about the Settlement; (10) the names of the law firms representing the Class, and contact information for the co-lead firms; and (11) information regarding how Class Counsel and the named Class Representatives would be compensated.  *See ECF No. 243 at ¶ 10; Simmons Decl., Ex. 1.*

---

[4] As used herein, the term "Class Member" refers to class member households, *i.e.,* joint accounts with multiple borrowers are only counted once, even though the class notices were addressed to all named borrowers on the account.  *Simmons Decl., ¶ 7 n.1.*

In the event that any Settlement Class Members desired further information, the Administrator set up a settlement website at www.floodinsurancesettlementbana.com. *Simmons Decl., ¶ 11.* Among other things, the settlement website included:

- The CAC;

- Plaintiffs' Preliminary Approval Motion and supporting memorandum;

- The Settlement Agreement and all exhibits thereto;

- The Court-approved Notice, and a Spanish translation;

- The Court-approved Claim Form, and a Spanish translation;

- The Court's Preliminary Approval Order;

- A series of short, easy to understand articles summarizing the claims in the lawsuit, the settlement terms, the class definition, and other pertinent information; and

- Links which allowed Class Members to submit a completed claim form online, or to contact the Administrator.

*Id.* Shortly after it was filed, Plaintiffs' Motion for Approval of Attorneys' Fees and Expenses (including all supporting papers) also was posted on the settlement website, and this motion for final approval will be posted as soon as it is filed as well. *Id.* In addition, the Administrator established a toll-free telephone hotline that Settlement Class members could call. *Id., ¶ 12.*[5]

## B.    <u>Response From The Settlement Class</u>

The reaction of the Settlement Class to the Settlement has been overwhelmingly positive. Out of 663,192 Class members who were sent a Settlement Notice, only 99 (0.015%) elected to opt-out by the deadline. *Simmons Decl., ¶ 14.* There were only four objections to the Settlement (excluding two objections that were withdrawn and one objection that was directed exclusively

---

[5] Both the settlement website and the telephone hotline were expressly referenced in the Settlement Notices. *See Simmons Decl., Ex. 1 at 8.* In addition, the Settlement Notices provided contact information for Co-Lead Class Counsel. *See Simmons Decl., Ex. 1 at 4-5.*

to Plaintiffs' Motion for Attorneys' Fees and Expenses).  *Id., ¶ 15.*[6] As discussed below at pages 18-35, these are meritless and should be overruled.

The relatively small number of opt-outs and miniscule number of objections stands in stark contrast to the number of Settlement Class members who have submitted claims for monetary relief under Paragraphs 29(ii) and (iii) of the Settlement Agreement.  To date, a total of **102,506** Claim Forms had been submitted to the Administrator.  *Id., ¶ 17.*  Although many Class members (*i.e.*, those who were charged for LPFI) will automatically receive monetary relief under Paragraph 29(i) of the Settlement Agreement regardless of whether they submit a claim, the number of claims for additional monetary relief as compared to the number of objections and opt-outs is compelling evidence that the Settlement is fair, reasonable, and adequate, and should be finally approved.

**C.    Relief to Be Provided After the Settlement Becomes Effective**

    **1.    Monetary Relief**

Pursuant to the Settlement, BoA has agreed to establish a ***non-reversionary Gross Settlement Fund of $31,000,000*** for the benefit of the Settlement Class.  *Agreement, ¶ 2(u).*  The net proceeds of this fund ("Net Settlement Fund"), after deducting any amounts approved by the Court for service awards, attorneys' fees and expenses, and the Claims Administrator's fees and expenses, will be distributed *pro rata* based on each Settlement Class Member's Settlement Shares.  *Agreement, ¶ 29.*  For purposes of allocating this fund, each Class Member's Settlement

---

[6] The miniscule number of objectors is especially meaningful given the overall effectiveness of the notice program.  Out of the 663,192 Settlement Notices that were mailed, only 7.8% were undeliverable after the Administrator's efforts.  *Simmons Decl., ¶ 10.*  These Notices were undeliverable despite the Administrator's efforts to verify address information for Settlement Class members prior to mailing (by referencing the National Change of Address Database), and additional efforts to obtain valid address information in the event that notices were returned (by checking for forwarding addresses and conducting a skip trace, if necessary).  *Id., ¶¶ 8-10.*

Shares will be calculated as follows on a cumulative basis (*i.e.,* Settlement Class Members may receive compensation under more than one category):

    a.    <u>Borrowers Who Were Force-Placed.</u>  Settlement Class Members who were lender-placed with flood insurance ("LPFI Class Members") during the Class Period shall receive Settlement Shares equal to 12% of their net lender-placed premiums. *Agreement, ¶ 29(i).*

    b.    <u>Borrowers Who Were Required to Purchase "Excess" Flood Insurance</u>. Settlement Class Members who timely returned a valid Claim Form stating that, for any particular year, they were required by BoA to purchase flood insurance in excess of their unpaid principal balance ("UPB"), line of credit, or principal limit (either excess force-placed insurance ("FPI") or excess private insurance or both) and that they did not want such coverage ("Coverage Claimants") shall receive Settlement Shares equal to the average amount that a Settlement Class Member would have paid for the average coverage amount of BoA's "gap" policies by purchasing insurance through the National Flood Insurance Program, as determined by Plaintiffs' Damages Expert,[7] for each year in which excess coverage is claimed. *Agreement, ¶ 29(ii).*

    c.    <u>Co-Op Borrowers Who Purchased Private Insurance Based on BoA's Requirements</u>. Settlement Class Members who are identified by BoA as residing in a Co-Op and who return a Claim Form stating that they were required by BoA to purchase private flood insurance in excess of their principal balance, line of credit, or principal limit (and did purchase such insurance) ("Co-Op Coverage Claimants") shall receive a settlement share equal to the amount that a Settlement Class Member would have paid for the average class flood insurance coverage amount by purchasing insurance through the National Flood Insurance Program, as determined by Plaintiffs' Damages Expert. *Agreement, ¶ 29(iii).*

Plaintiffs' Damages Expert, Arthur Olsen, will calculate the total Settlement Shares for all Eligible Class Members, and determine the amount owed to each Eligible Class Member (based upon their *pro rata* share of the Net Settlement Fund), within 10 days of the Court's Final Approval Order. *Agreement, ¶ 30.*  For purposes of this motion, however, Mr. Olsen has conducted a preliminary analysis based on the class data and the claim forms that have been

---

[7] Plaintiff's Damages Expert is Arthur Olsen.  Mr. Olsen is a well-regarded data expert who has performed extensive data analyses in this case as well as other class action cases involving banks, including both FPI class actions and cases dealing with bank overdrafts. *See Olsen Decl., ¶¶ 5-7 & Ex. 1.*

processed to date. *See Olsen Decl., ¶¶ 8-19.* Based on the class data, Mr. Olsen preliminarily calculates that there are approximately 312,945 class member households that incurred $669,426,496.90 in net written premiums for LPFI during the Class Period, and are entitled to Settlement Shares totaling $80,331,187.03 under Paragraph 29(i) of the Settlement Agreement. *Id., ¶ 10.*[8] Based on the claim forms that have been submitted and processed, Mr. Olsen further estimates, on a preliminary basis, that an additional $34,713,022.50 has been claimed by Settlement Class Members under Paragraphs 29(ii) and (iii). *Id., ¶ 17.* Thus, the total Settlement Shares are preliminary estimated to be approximately $115,044,209.53, and each Settlement Class Member will be entitled to gross compensation (before deduction for attorneys' fees, expenses, and service awards) equal to approximately 26.95% ($31,000,000 / $115,044,209.53) of their total Settlement Shares. *Id., ¶ 18.* On an individual basis, this gross payment is preliminarily estimated to be, on average, approximately:

- $69.18 for class members who did not submit a claim but are automatically entitled to compensation under Paragraph 29(i) (because they were charged for LPFI);

- $104.98 for class members who submitted a claim but are not entitled to automatic compensation under Paragraph 29(i) (because they were not charged for LPFI); and

- $174.16 for class members who submitted a claim and are also entitled to compensation under Paragraph 29(i) (because they were charged for LPFI).

*Id., ¶ 19.*

Settlement Class Members who are entitled to a payment will be paid by check, unless they have an active escrow account and an active mortgage loan or home equity line of credit serviced by BoA, in which case they may be paid via an escrow credit. *Agreement, ¶ 33.* If any checks are not cashed within 180 days of distribution, such funds will be redistributed to other

---

[8] These totals do not include LPFI charges to Co-Op Borrowers, which are to be fully refunded by BANA outside of the Settlement Fund, pursuant Paragraph 23 of the Settlement Agreement. *Id. ¶ 10 n.1.*

Settlement Class Members who received escrow credits or negotiated their checks (if there is more than $750,000 remaining), or alternatively, such funds will be distributed to the Center for Responsible Lending as a *cy pres* award. *Agreement, ¶ 39.*[9]  The Gross Settlement Fund is non-reversionary; no unclaimed funds will revert to BoA at any time. *Id. at ¶ 27.*

### 2.    Prospective Relief

In addition to the foregoing monetary relief, BoA has agreed to significant prospective relief.  First, to address Plaintiffs' claims relating to improper "commissions," BoA has agreed that neither BoA nor its affiliates shall receive any commission payments for three years from the Effective Date of the Settlement Agreement in connection with LPFI on any property securing a residential mortgage loan, home equity line of credit, reverse mortgage, or security instrument secured by shares in a cooperative housing association. *Agreement, ¶ 18.*

Second, to address Plaintiffs' claims relating to excessive flood insurance coverage requirements, for three years from the Effective Date of the Settlement Agreement, BoA shall permit qualifying Settlement Class Members to opt-out of BoA's higher flood coverage requirement.  Specifically, upon request, BoA shall provide a Flood Coverage Opt-Out Form to any member of the Settlement Class whose UPB on their mortgage loan, line of credit amount under their home equity line of credit, or principal limit on their reverse mortgage loan is less than $250,000. *Agreement, ¶ 19.*  For three years from the Effective Date of the Settlement Agreement, BoA also shall enclose a Flood Coverage Opt-Out Form with each "gap" cycle letter requesting additional flood insurance coverage. *Id., ¶ 20.*  This Flood Coverage Opt-Out Form will provide each Settlement Class Member who receives it an opportunity to elect to maintain

---

[9] The Center for Responsible Lending is a nonprofit, non-partisan organization that works to protect homeownership and family wealth by fighting predatory lending practices. *See* http://www.responsiblelending.org/about-us/.

flood insurance coverage in the amount of the Settlement Class Member's UPB/line of credit amount/principal limit, where the Settlement Class Member's UPB/line of credit amount/principal limit is less than $250,000.

Third, to address the Lemmers' claim that the National Flood Insurance Act does not require borrowers who own shares in a housing cooperative to maintain flood insurance on their individual cooperative unit,[10] BoA shall not knowingly require Class Members in housing cooperatives to maintain flood insurance coverage where flood insurance is not independently required by their security instrument, and shall fully refund Co-op Borrowers for any LPFI that was not required by their security instrument to the extent that BoA becomes aware of such coverage. *Agreement*, *¶ 23*. The refunds that have been made or will be made by BoA to Co-op Borrowers will not be paid out of, or in any way reduce, the Gross Settlement Fund. *Id*.

## III.    ARGUMENT

### A.    Standard of Review on Motion for Final Approval

The standard for granting approval of a class action settlement is whether the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e). This determination rests within the sound discretion of the court. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). However, the court begins its analysis with an "initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." Newberg on Class Actions § 11:41 (4th ed. 2006) ("Newberg"); *accord*, *Dickerson v. Cable Commc'ns, Inc.*, 2013 WL 6178460, at *2 (D. Or. Nov. 25, 2013)

---

[10] *See* Loans in Areas Having Special Flood Hazards; Interagency Questions and Answers, Regarding Flood Insurance, Fed. Reg. 35,914 at 35,943 (July 21, 2009), *available at* http://edocket.access.gpo.gov/2009/pdf/E9-17129.pdf.    *Accord*, National Flood Insurance Manual at GR 7 (October 1, 2011), available at http://www.fema.gov/business/nfip/manual.shtm (listing "Cooperative Unit within Cooperative Building" as an "ineligible risk").

("Courts within the Ninth Circuit put a good deal of stock in the product of an arms length, non-collusive, negotiated resolution") (quotation omitted) (Simon, J.).  This is because "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Synocor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)); *Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 542 (W.D. Wash. 2009).

The Ninth Circuit has stated that courts should consider several factors as part of the fairness determination, including:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Dickerson*, 2013 WL 6178460, at *2.  However, the "'relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case.'"  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982).  Accordingly, "[n]ot all of these factors will apply to every class action settlement.  Under certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval." *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

**B.    The Settlement Warrants Final Approval**

Here, the Court has already found that "the Settlement Agreement is the result of arms-length negotiations conducted after Class Counsel adequately investigated the claims of the named Plaintiffs and the Settlement Class and became familiar with the strengths and

10

weaknesses of those claims. The assistance of an experienced mediator in the settlement process supports the Court's conclusion that the Settlement is non-collusive." *ECF No. 243, ¶ 9.* Accordingly, the Settlement is entitled to a presumption of fairness. *See supra* at 9. Moreover, aside from this presumption, each of the *Hanlon* factors weighs heavily in favor of approval.

### 1. The Amount of Relief Provided by the Settlement Is Significant

The amount of the Settlement – $31 million – speaks for itself. To Class Counsel's knowledge, ***this is the largest common fund settlement in the history of lender-placed flood, hazard, or wind insurance litigation***. *See Richter Decl., ¶ 7.* Moreover, as set forth above, the Settlement provides for significant additional prospective relief. *See supra* at 8-9. Although the parties have not placed a specific dollar value on this prospective relief, they "agree that the value of the prospective relief … is substantial." *Agreement, ¶ 26.*[11] Accordingly, the amount of the Settlement more than satisfies the standard for court approval.

Although certain objectors argue that Plaintiffs should have held out for even more, "courts must tread cautiously when comparing the amount of a settlement to speculative figures regarding what damages 'might have been won' had [plaintiffs] prevailed at trial." *White v. Experian Information Solutions, Inc.*, 803 F. Supp. 2d 1086, 1098 (C.D. Cal. 2011) (*quoting Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)), *overruled on other grounds*, *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013). The $31 million Gross Settlement Fund constitutes a significant percentage of Class Members' overall damages and their Settlement Shares approximating those damages (which treat 12% of ***all*** LPFI premiums as "inflated" and further account for claimed damages due to excessive flood

---

[11] In evaluating the non-monetary relief in this case, it is not necessary to place a dollar value on it. *Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 924 (9th Cir. 2014). Rather, the Court is simply required to consider such relief when evaluating the fairness of the Settlement. *Id.*

insurance requirements).  The amount of this recovery compares favorably with other cases and is reasonable.  *See In re Checking Account Overdraft Litig.*, 830 F.R.D. 1330, 1346 (S.D. Fla. 2011) (recovery of 9 percent was reasonable); *Newbridge Networks Sec. Litig.*, 1998 WL 765724, *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly 6 to 12 percent of a potential recovery ... seems to be within the targeted range of reasonableness"); *accord*, *Johnson v. Brennan*, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

**2.    The Relief Is Reasonable in Light of the Strengths and Weaknesses of the Claims, and Risks, Expense, Complexity, and Duration of Further Litigation**

The negotiated relief is particularly impressive when considered against: (1) the risks associated with Plaintiffs' claims and class certification (which the Objectors fail to address whatsoever); and (2) the expense, complexity, and likely duration of further litigation.

**a.    Litigation Risks**

In continuing to litigate this consolidated action, Plaintiffs would have faced significant risks on the merits of their claims.  Although Plaintiffs believe that their claims are strong and that they could have been successful at trial, the current state of the law with respect to their claims demonstrates that these are not "slam dunk" claims.  Specifically, with respect to Plaintiffs' claims regarding allegedly unlawful commissions, certain courts have dismissed these types of claims in other LPI cases.  *See, e.g.*, *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013); *Decambaliza v. QBE Holdings, Inc.*, 2013 WL 5777294, at *5-9 (W.D. Wis. Oct. 25, 2013); *Singleton v. Wells Fargo Bank, N.A.*, 2013 WL 5423917, at *2 (N.D. Miss. Sept. 26, 2013).  Although this Court and others have allowed such claims to proceed past a motion to

dismiss,[12] it is uncertain whether Plaintiffs would have maintained a litigation class through trial and prevailed at trial, or how the Ninth Circuit would rule on the merits of these claims in the event of any appeal.

As to Plaintiffs' claims relating to allegedly excessive flood insurance requirements, several other courts – including two circuit courts – have dismissed similar claims.  *See, e.g.,* *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014); *Kolbe v. BAC Home Loans Serv., LP*, 738 F.3d 432, 443-53 (1st Cir. 2013) ("*Kolbe III*") (*en banc*); *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 269133, at *6-9 (N.D. Cal. Jan. 24, 2013); *Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1040-44 (N.D. Cal. 2013); *McKenzie v. Wells Fargo Bank, N.A.*, 2012 WL 5372120, at *13 (N.D. Cal. Oct. 30, 2012); *Lacroix v. U.S. Bank, N.A.*, 2012 WL 2357602 (D. Minn. June 19, 2013).  Moreover, the United States Government took the position in *amicus* briefs in both *Feaz* and *Kolbe* that lenders may require FHA borrowers (such as Plaintiff Skansgaard) to maintain more flood insurance than is required by the U.S. Department of Housing and Urban Development ("HUD") or federal law.  Thus, although this Court and other courts have allowed such "excess coverage" claims to proceed past motions to dismiss,[13] it is once again uncertain whether Plaintiffs ultimately could have prevailed on such claims.[14]

---

[12] *See, e.g.*, *Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255, 267 (N.D.N.Y. 2013); *Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093, 1115 (N.D. Cal. 2013); *Simpkins v Wells Fargo Bank, N.A.*, 2013 WL 4510166, at *7 (S.D. Ill. Aug 26, 2013); *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1088 (N.D. Cal. 2012); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 955-61 (N.D. Cal. 2012); *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012); *Williams v. Wells Fargo Bank, N.A.*, 2011 WL 4901346, at *2, *4 (S.D. Fla. Oct. 14, 2011).

[13] *See e.g.*, *Lass v. Bank of America, N.A.*, 695 F.3d 129 (1st Cir. Sept. 21, 2012); *Morris v. Wells Fargo Bank N.A.*, 2012 WL 3929805 (W.D. Pa. Sept. 7, 2012); *Skansgaard v. Bank of Am., N.A.*, 896 F. Supp. 2d 944 (W.D. Wash. 2011); *Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586 (E.D. Pa. 2011).

[14] This uncertainty is starkly illustrated by the proceedings in the *Kolbe* case, where (1) the district court dismissed the plaintiff's excess coverage claims, *see Kolbe v. BAC Home Loans Servicing, L.P.*, 2011 WL 3665394 (D. Mass. Aug. 18, 2011) ("*Kolbe I*"); (2) the First Circuit

###### b.   Class Certification Risks

Plaintiffs also faced significant risks on class certification.  Even though Plaintiffs' Counsel had success certifying a national TILA class in *Hofstetter v. Chase Home Fin., LLC*, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011), and certified certain multi-state classes spanning 40 states in *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953 (N.D. Cal. June 13, 2014), and other courts have certified national classes in other LPI cases,[15] it was not guaranteed that the Court would have certified a nationwide class (or any class) on a contested class certification motion in this case or the other cases that are now consolidated in this action.  In a number of recent LPI cases – including one district court case in the Ninth Circuit involving BoA – class certification was denied.  *See Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529 (C.D. Cal. 2013); *Gooden v. Suntrust Mortg.,* 2013 WL 6499250 (E.D. Cal. Dec. 11, 2013); *Gordon v. Chase Home Fin., LLC*, 2013 WL 436445 (M.D. Fla. Feb. 5, 2013); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013).  In other LPI cases, the classes that have been certified have been limited to single-state classes.  *See Lane*, 2013 WL 3187410 (certifying class of California borrowers to pursue claims against Wells Fargo related to improper commissions in connection with LPFI); *Williams*, 280 F.R.D. at 675-76 (certifying

---

later reversed the district court in a 2-1 panel opinion, *see Kolbe v. BAC Home Loans Servicing, L.P.*, 695 F.3d 111 (1st Cir. 2012) ("*Kolbe II*"); and (3) the First Circuit then vacated the panel decision, took up the matter *en banc*, and split three-to-three, resulting in an affirmance of the district court decision dismissing the action by default.  *See Kolbe III*, 738 F.3d at 436.

[15] *See Brand v. Nat'l Bank of Commerce*, 213 F.3d 636, 2000 WL 554193, at *1 (5th Cir. 2000) (certifying nationwide class to pursue allegations that defendant "charged borrowers more than the cost of the insurance under a system of kickbacks from the insurer"); *Hall v. Midland Group*, 2000 WL 1725238, at *1, *3 (E.D. Pa. Nov. 20, 2000) (certifying nationwide class where "[t]he essence of plaintiff's allegations [was] that defendant [] engaged in the forced placement of hazard insurance through agencies owned by affiliates . . . which received commissions for these placements."); *Robinson v. Countrywide Credit Indus.*, 1997 WL 634502, at *4, *5 (E.D. Pa. Oct. 8, 1997) (certifying nationwide class where "the central issues revolve[d] around whether the form contracts authorized placement of the type of insurance purchased and whether Countrywide knowingly purchased inflated or expensive policies to generate commissions.").

class of Florida borrowers to pursue claims against Wells Fargo relating to inflated premiums and unlawful kickbacks in connection with lender-placed hazard insurance). Moreover, any class certification decision likely would have been the subject of appeals, such as the one that U.S. Bank is currently pursuing before the Ninth Circuit (on an interlocutory basis) in *Ellsworth*. By settling the case at this juncture, and obtaining BoA's consent to nationwide class certification, Plaintiffs wisely have sought to assure class-wide relief to the broadest possible set of class members.[16]

### c.    Expense, Complexity, and Duration of Further Litigation

One thing that *is* certain is that further adversarial litigation would have been time-consuming and costly. As demonstrated by Plaintiffs' Motion for Approval of Attorneys' Fees and Expenses, the time and financial resources that have been invested in this litigation already is staggering. *See ECF No. 246.* If the litigation were to continue, the amount of time and expense only would have grown – perhaps several fold. This settlement resolves not just one action, but seven distinct putative class actions that were pending in federal courts across the country. Without a settlement, it is likely that contested motions for class certification and summary judgment would have been filed in each case, followed by trials and appeals in multiple circuit courts. Resolving the litigation at this time avoids these possibilities, and saves time and expense for the parties and the court system as a whole.

These were just a few of the obstacles that remained for Plaintiffs and the Settlement Class going forward. By entering into the Settlement, Plaintiffs have avoided the risks, costs,

---

[16] As other courts have noted, "[t]he requirements for class certification are more readily satisfied in the settlement context than when a class has been proposed for the actual conduct of the litigation." *White v. Nat'l Football League*, 822 F. Supp. 1389, 1402 (D. Minn. 1993) (citations omitted); *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 302 (3d Cir. 2011) (*en banc*); *Horton v. Metropolitan Life Ins. Co.*, No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21395, at *15 (M.D. Fla. Oct. 25, 1994).

and delay of further litigation, and have locked in substantial and immediate relief for the Settlement Class. This further illustrates the reasonableness of the Settlement. Indeed, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlement" in class cases. *Medearis v. Oregon Teamster Employers Trust*, 2009 WL 1788183, *3 (D. Or. June 19, 2009) (quotation omitted).

### 3.    The Settlement Comes at an Appropriate Stage, After Exhaustive Discovery

The reasonableness of the Settlement is further evidenced by the fact that it was reached after years of litigation and exhaustive discovery. As outlined above and in Plaintiffs' Preliminary Approval Memo, this matter was only resolved after extensive adversarial litigation of Plaintiffs' claims in multiple venues over a number of years. *See ECF No. 228 at 5-7; see also ECF No. 247*, ¶¶ 14-79. Moreover, the settlement negotiations were informed by extensive discovery conducted by Plaintiffs. *ECF No. 228 at 7; see also ECF No. 247*, ¶¶ 14-79. Specifically, the parties conducted almost two dozen depositions, including several Rule 30(b)(6) depositions of BoA's corporate representatives as well as third parties. *Id.* This was in addition to Plaintiffs' review of over *four million pages of documents* and extensive class data obtained from BoA and its LPFI vendors. *Id.* There is no question that this case settled only after the claims were tested in litigation, and both sides investigated the relevant facts and pertinent law.

### 4.    The Experience and Views of Counsel Support Approval of the Settlement

The fairness of the Settlement is further evidenced by the fact that it was negotiated at arms' length by experienced and capable counsel. In appointing the undersigned as Class Counsel, this court has already recognized the experience and expertise of Plaintiffs' counsel. *See ECF No. 243* (appointing Plaintiffs' counsel as class counsel); *see also ECF 228 at 29-30* (detailing counsel's qualifications and expertise in LPI ligitation). In addition, BoA was

represented in this case by a nationally-recognized defense firm, with expertise in defending LPI cases and other complex class actions.  "The experience and views of counsel further support a finding that the settlement is fair.  As courts have noted, 'the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight.'"  *White*, 803 F. Supp. 2d at 1099 (quoting *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980)); *see also Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (quotation omitted).

### 5.    The Reaction of the Class to the Settlement is Overwhelmingly Positive

The positive reaction of the Settlement Class to the Settlement further demonstrates that the Settlement is fair and reasonable.  *See  Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").  As noted above, out of 663,192 Settlement Class members who were sent a Settlement Notice, there were only 99 opt-outs and 4 objections -- representing less than one thousandth of one percent (0.0006%) of all Class members.  *See supra* at 4.   By contrast, over 100,000 claims for monetary relief have been filed, and many Class members are entitled to monetary relief under Paragraph 29(i) of the Settlement regardless of whether they submit a claim.  *See supra* at 5.  These numbers represent an excellent reaction from the Settlement Class, and weigh strongly in favor of final approval.  *See, e.g. Hughes*, 2001 WL 34089697, *8 (finding that the "class members overwhelmingly support[ed] the settlement" where there were over 37,000 notices sent out, 2,745 class members participated in the settlement, and there were only 86 timely opt-outs and 9 objections); *Marshall v. Holiday Magic,*

*Inc.*, 550 F .2d 1173, 1178 (9th Cir. 1977) (approving settlement where approximately 1% of 31,000 class members opted out; "the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness").

### 6. The Views of the Government Also Support Approving the Settlement

Finally, the views expressed by the government also support approval of the Settlement. As noted above, the United States Government submitted an amicus brief in *Kolbe* (a case involving BoA) opposing the plaintiff's excess coverage claims in that case. *See supra* at 13. Given this opposition and the end result that ensued in the *Kolbe* case, it is remarkable that Plaintiffs in this consolidated action have achieved a Settlement that provides both monetary and prospective relief to Settlement Class Members in connection with their excess coverage claims.

### C. The Objections to the Settlement are Meritless and Should be Overruled

In light of the substantial benefits provided by the Settlement, and the substantial risks associated with continuing the litigation, it is not surprising that there have been only ***four*** objections to the merits of the Settlement. Although the motivation behind these objections is unclear, it is well-known that certain law firms, and sometimes their clients, have adopted a business model of attempting to interfere with class action settlements in an effort to extort payments from the parties to those settlements. As one law review article recently explained:

> [A]ll too frequently, objectors and their counsel see an opportunity to extract money from the parties or class counsel, whose efforts brought about the settlement, by threatening to upset or seriously detour the settlement. Objectors make arguments that are groundless yet sufficient to delay the settlement approval process for months or years unless class counsel or the parties agree to "buy off" the objector or the objector's counsel. Objector tactics can prove lucrative because the other parties may prefer to "buy off" the objectors rather than suffer the delay and additional expense necessary to defeat the objection.

Bruce Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 ST. JOHN'S LAW REV. 949, 950 (2010); *see also* John E. Lopatka, D. Brooks Smith, *Class Action Professional Objectors: What To Do About Them?*, 39 Fla. St. U. L. Rev. 865 (2012) (co-authored by Third Circuit Judge D. Brooks Smith).[17]  For the reasons explained below, each of the four objections here are meritless.[18]

**1.     The Hannas' Objections Are Meritless**

The objections by Glenn and Carin Hanna (the "Hannas") are meritless and appear to be attorney-driven.  The Hannas' Counsel represent the plaintiff in another putative class action against BoA concerning LPFI, *Serpa v. Bank of America, N.A.*, No. 5:14-cv-01443 (N.D. Cal.). *ECF No. 260, ¶ 2.*  In *Serpa*, there has been no Rule 12 motion, no responsive pleading, no case management or scheduling order, no protective order, and no indication that discovery of any kind has taken place.  Indeed, *Serpa* was only filed on March 28, 2014, ***over two years after*** this matter was filed and nearly two months ***after*** the parties announced, on the record, that they had reached a class settlement.[19]  Given the substantive overlap between *Serpa* and this case, as well as the chronology of the two cases, *Serpa* can only be viewed as a copycat action.

Counsel objecting to LPI settlements in the hopes of protecting their later-filed copycat actions have a poor track record.  For example, in *Hofstetter* (which also dealt with LPFI), the

---

[17] *See also In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 n.30 (S.D. Fla. 2011) ("[M]ost if not all of the Objections are motivated by things other than a concern for the welfare of the settlement class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto."); FED. R. CIV. P. 23(e)(4), advisory note (2003) ("Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay.").

[18] This brief only responds to objections related to the merits of the Settlement.  Objections and portions of objections related to Plaintiffs' Motion for Approval of Attorneys' Fees and Expenses were addressed separately in Plaintiffs' Reply Brief in support of that motion.

[19] The Settlement was first announced in a joint status report filed January 17, 2014.  *ECF No. 219.*  For details regarding the procedural history referenced above, see Plaintiffs' Memorandum in Support of Preliminary Approval, ECF No. 228, at 6-7.

court considered an objection from counsel for a client who had filed a copycat action in another

state, and sought to protect his ability to litigate that action.  The Court summarily rejected this

objection in a written opinion, as follows:

> Mr. Gibson notes in his brief that he is a proposed class representative in a
> different action against defendants, currently pending in [another state]. But that
> action is in its early stages, and no motion for class certification has yet been
> filed, much less granted. Accordingly, Mr. Gibson has no standing to represent
> any alleged class from that other action. ... If Mr. Gibson viewed the settlement
> terms as [disfavorable], then his remedy was to opt out. He did not.

*Hofstetter v. Chase Home Finance, LLC*, 2011 WL 5415073, at *3 (N.D. Cal. Nov. 8, 2011).

Moreover, the court was even more emphatic at the final approval hearing, describing the

objector's position as "totally unfounded."  *See* Transcript of Proceedings in *Hofstetter v. Chase*

*Home Finance, LLC*, No. 1:10-cv-01313 (N.D. Cal.) (Nov. 7, 2011) ("And if that [nationwide

settlement] hurts you and your me-too case …, too bad.  …  [Y]our position is totally

unfounded.")).

Similarly, the Hannas are very late to the game in this matter.  At various points in their

objection, they note that they were "not prepared to litigate the issue" and "hope that a class

action settlement…will save them from the need to bring their own claim."  *Hanna Objection at*

*5,12*.  Unlike the Hannas, the named Plaintiffs in this case were ready and willing to litigate these

issues, and have obtained an excellent recovery for the Settlement Class.  The three arguments

asserted by the Hannas do not change that fact.

### a. Plaintiffs Have Provided Sufficient Information Regarding the Value of the Claims

The Hannas complain that, because the preliminary approval memo compared the size of

the Settlement Fund to the amount of commissions paid to BoA's affiliates, *see ECF No. 228 at*

*16-17*, Plaintiffs supposedly have not provided a proper frame of reference for comparison.

20

Specifically, the Hannas contend that Plaintiffs have failed to value the "over-insurance" claims (which the Hannas also refer to as "overpayment" claims), which were a part of the allegations in this case and which are the focus of the Hannas' Counsel's copycat *Serpa* action.   *Hanna Objection at 14*.

The Ninth Circuit recently rejected a challenge to the sufficiency of a class settlement notice in which the objectors raised just this argument.  *See Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012), *cert. denied*, 134 S. Ct. 8 (2013).  In *Lane*, the Ninth Circuit restated its general standard that notice must "generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Id.* at 826 (quotation omitted).  The Court then went on to state that this "standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, and it does not require an estimate of the potential value of those claims."  *Id.*  Because this objection has been specifically rejected by the Ninth Circuit, it should be overruled here.

In support of their objection, the Hannas assert that the over-insurance claims could be valued at "possibly more than a billion dollars."  *Hanna Objection at 14*.  Because the Hannas' counsel conducted no discovery in their copycat action, that figure is pure speculation.  It is clear, however, that in making this assertion, the Hannas have not considered the state of the law or the section of Plaintiffs' Preliminary Approval Memo covering litigation risks.  *See ECF No. 228 at 18-20*.  As noted in that brief (and once again here), similar over-insurance claims have been dismissed by at least six courts, including two circuit courts.  *See supra* at 13 (citing *Feaz*, *Kolbe*, *Lane, Cannon*, *McKenzie*, and *Lacroix*).  Notably, these dismissals include not just one, but three cases from the Northern District of California (*Lane, Cannon*, and *McKenzie*), where Objector's Counsel's copycat action is venued.  Moreover, the Hannas' objection overlooks the

Government's amicus brief in *Kolbe*. The current state of the law with respect to these types of claims belies the Hannas' lofty valuation.

In this legal context, the recovery – both prospective and retrospective – that Plaintiffs have recovered for Settlement Class members with over-insurance claims is nothing short of exceptional. Settlement Class members who submit claim forms will receive Settlement Shares equal to the average value of the over-insurance claims, subject to the *pro rata* reduction. *Agreement, ¶ 29(ii)*. Further, BoA has agreed to substantial prospective relief, including allowing Settlement Class members to opt out of the allegedly excessive coverage requirement. *Settlement Agreement*, *¶ 19*. That the Hannas make no mention of this injunctive relief, which will address the precise issue which forms the heart of their complaints about BoA's conduct, suggests that the Hannas have little interest in seriously evaluating this Settlement.

Further, this Settlement compares very favorably to other LPI settlements in its treatment of over-insurance claims. For example, in *Fladell v Wells Fargo*, No. 13-cv-60721 (S.D. Fl.), the parties reached, and the court has preliminarily approved, a settlement resolving all LPI claims, including over-insurance claims, for all types of LPI, including LPFI. *See Fladell*, ECF Nos. 158-1, 168. Under that settlement, class members who submit a claim form (and only those class members who submit a claim form) will receive a check or escrow credit equal to either 7% or 11% of their LPI premiums, with no additional monetary recovery or prospective relief for those who allege their flood insurance coverage requirements were excessive. *See Fladell*, ECF No. 158-1, ¶ 4.5. Nevertheless, the *Fladell* settlement releases over-insurance claims. *Id. ¶ 10.1, 10.1.1* (explicitly releasing all claims related to both the "coverage amount" and to any "alleged excessiveness" of LPI). The current state of the law on over-insurance claims explains why the *Fladell* settlement was preliminarily approved, and there certainly is no reason for this Court to

deny approval of the Settlement in this case (which is far more favorable in its treatment of over-insurance claims).

> ### b.    Plaintiffs Have Provided Sufficient Information Regarding the Calculation of the Monetary Recovery

The Hannas next take issue with the Class Notice in this case, claiming it did not sufficiently inform Class members about their potential recovery.  This argument ignores the fact that this Court already reviewed the Notice, proposed amendments thereto, and found:

> the Class Notice, as amended…will provide the best notice practicable, satisfies the notice requirements of Rules 23(c)(2)(B) and 23(e), adequately advises members of the Settlement Class of their rights under the Settlement, and meets the requirements of due process.  The Class Notice, as amended, fairly, plainly, accurately, and reasonably provides Settlement Class members with all required information[.]

The Hannas provide no reason for this Court to revisit that finding.  The Hannas reference three Ninth Circuit decisions which they assert support their position, but all three of those decisions *overruled* the exact objection the Hannas assert here.  *See Hanna Objection at 18-22* (citing *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1177-78 (9th Cir. 1977); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009)).  The Hannas do not cite a single case in the Ninth Circuit where the objection they assert prevailed.  This absence is telling.

The standard set by the Ninth Circuit on this issue is clear, and not demanding.  Notice provided to a class must simply "describe[] the aggregate amount of the settlement fund and the plan for allocation."  *Rodriguez*, 563 F.3d at 962.  The notice in this case does exactly that: the notice informs Class members that the aggregate amount of the settlement is $31,000,000, and then, in language the Hannas themselves quote, informs them of the plan to allocate that fund. *ECF 273-1 at 60-10*; *Hanna Objection at 7*.

Relying on *Holiday Magic*, the Hannas insist that the detailed plan of allocation contained in the settlement notice is not a "formula," and thus is insufficient. *Hanna Objection at 19*. However, the Ninth Circuit has not always maintained that a "formula" is needed; as *Rodriguez*, quoted above, made clear, a "plan for allocation" also passes muster. This flexible terminology, as well as the fact that the Ninth Circuit has ***never*** overruled final approval of a class settlement on these grounds, suggests that the type of mathematical precision the Hannas request is simply not required.

Nor is it sufficient to argue, as the Hannas do, that the notice is flawed because it relies on amounts yet to be determined. This argument was rejected in the very case the Hannas cite:

> [Objectors] argue that the notice did not fairly apprise class members of their positions because it did not specify their potential recovery. It is obvious, however, that this was a matter of conjecture since it was unknown how many class members would opt out or submit claims. The aggregate amount available to all claimants was specified and the formula for determining one's recovery was given. Nothing more specific is needed.

*Holiday Magic*, 550 F.2d at 1177-78. In this case, as in *Holiday Magic*, the number of opt-outs and submitted claims were – by necessity – unknown at the time of notice. Plaintiffs cannot, therefore, be penalized for failing to provide all of the information required for Class members to compute their individual recovery.

Despite *Holiday Magic's* clear holding that class counsel is not required to engage in "conjecture" to estimate class member recoveries, 550 F.2d at 1177, the Hannas suggest exactly that. *See Hanna Objection at 16-17* (arguing that the "estimated value of the settlement shares," based on "reasonable assumptions," should be shared with the class, so class members can "roughly" estimate recovery (emphasis in original)). Providing information of this sort is inadvisable, because initial estimates of variables such as claims rates often are inaccurate, and providing inaccurate or unreliable information to Class members is a serious concern. More

24

importantly, providing rough estimates of this sort is simply not required by law, and thus the Hannas' objection provides no basis for denying final approval.

Further, the settlement affirmed by the Ninth Circuit in *Torrisi* is strikingly similar to this case, both in terms of the amount and structure of the settlement, and the form of the notice.  In *Torrisi*, as the Hannas acknowledge, there was a common fund of $30 million, from which class members would receive a recovery "proportional" to their damages.  8 F.3d at 1374; *Hanna Objection at 20*.  The Hannas acknowledge that this language means that each class member recovery "would be reduced in the same ratio" that the fund "bore to the total loss of all shareholders."  *Hanna Objection at 20*.  That is exactly how the *pro rata* recovery and settlement shares function in this case.  The Hannas spend pages criticizing the "mysterious settlement shares" in this case, *id.* at 6-8, without ever acknowledging that functionally identical methods of allocation have been affirmed by the Ninth Circuit.  For all of the above reasons, the Hannas' challenge to the Class Notice fails.

### c.    Calculation of Individual Recovery After Final Approval is Permissible

In a final objection which takes approximately one page and cites only one out-of-circuit case, the Hannas argue that final approval should be denied because the exact amount of class member recovery will not be determined until after a final approval order is issued.  This argument is critically flawed.

The sole case the Hannas rely upon is not binding and is manifestly distinguishable.  In *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. June 2, 2014), the Seventh Circuit held that "[t]he settlement should have been disapproved on multiple grounds," including, *inter alia*, that class counsel was the son-in-law of the class representative, the claim form was flawed, and the claims process kept class members from receiving their recovery.  *Id.* at 723.  Nowhere does the *Eubank*

25

opinion state that the timing of the calculation of recovery was the sole or even a primary factor among the laundry list of reasons for reversal.

Additionally, the court in *Eubank* did not criticize the fact that individual recoveries were not going to be determined until after the final approval hearing – rather, it criticized the fact that the claims deadline was not until after the final approval hearing, which, given the claims-made structure of that settlement, meant that the *gross value of the settlement* was unknown. *Id.* In this case, the gross value of the settlement is known: $31,000,000.00. This fact alone distinguishes *Eubank*.

Further, *Eubank* represents the minority view. In recent LPI litigation alone, there have been at least three settlements approved in which claims information was not known at the time of final approval – including one in which *Hanna's counsel represented the plaintiffs*. *See Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683, 696 (S.D. Fla. 2014) ("This Court May Properly Approve the Settlement Without Knowing the Exact Number of Claims Filed") (capitalization in original); *see also Casey v. Citibank, N.A.*, No. 5:12-cv-00820, ECF No. 221 (N.D.N.Y. Aug. 21, 2014) (fact that "the deadline for filing claims [would] not expire until 120 days after final approval" did not affect fairness, reasonableness, or adequacy of settlement); *Wahl v. American Security Insurance Co.*, No. 5:08-cv-00555, ECF No. 189 at 10-11 (N.D. Cal. 2011) (final approval order directing payment be made to those "who submit a timely valid Claim Form"); *Id.*, ECF 177-1 at 8 (final approval memo signed by attorney Stephen F. Yunker with no information regarding claims rate, presenting only "potential" value of settlement "if every class member submits a claim"). Accordingly, the Hannas' objections are meritless and should be overruled.

26

## 2. The Hall Objections, Prepared With the Assistance of a Professional Objector, Are Meritless

The objection submitted by nominally *pro se* class members Daniel J. and Lanette L. Hall ("the Halls") appears unremarkable until the last page, where they state that the objection was "prepared with the assistance of" attorney Christopher A. Bandas. As discussed below, Mr. Bandas is well known to the judiciary and the class action bar, and his involvement requires the court to exercise extreme caution when evaluating this objection.

### a. Attorney Bandas Is a Professional Objector

Mr. Bandas has a long history of filing frivolous objections and appeals for the purpose of extorting money from court-appointed class counsel, which is documented in federal judicial opinions and undermines the credibility of those associated with him. As one court explained:

> [A]ttorney Christopher Bandas, [is] a "professional" or "serial" objector … [Mr.] Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct.

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (footnote omitted); *see also In re Hydroxycut Marketing and Sales Practices Litig.*, 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) ("Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made."). Mr. Bandas' scheme has repeatedly been found to be "meritless," "frivolous," "vexatious" and/or "filed for [an] improper purpose."[20] The present objection appears to be yet another example.

---

[20] *See In re Hydroxycut*, 2013 WL 5275618, at *5 ("In light of Mr. Bandas's scheme, the Court finds [the objections] were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections."); *In re Gen. Elec. Co. Sec. Litig.*, 2014 WL 534970, at *9 (S.D.N.Y. Feb. 11, 2014) ("Christopher A. Bandas … has been repeatedly admonished for

The Halls may insist that they are raising this objection on their own, with only Mr. Bandas' assistance. However, Mr. Bandas has used methods such as this to conceal or minimize his involvement in class action objections in the past. *See In re Gen. Elec.*, 2014 WL 534970, at *9 ("while [objector] is appearing pro se before this Court, he admits that he is 'represented in this matter' by attorney Christopher A. Bandas"); *In re Cathode Ray Tube*, 281 F.R.D. at 533 ("[objector's] papers do not list counsel, but [] Plaintiffs showed that [objector] previously objected to another class settlement in which he was assisted by attorney Christopher Bandas, a 'professional' or 'serial' objector located in Corpus Christi, Texas. In fact, [objector's] objection in this case was postmarked in Corpus Christi, Texas, even though [objector] lives and works in Denver, Colorado."). Thus, this Court should view the Halls' objection with extreme skepticism.

### b. The Halls' Objections Are Meritless

The Halls' primary substantive objection is to the *cy pres* award.[21] However, the Settlement provides that the *entirety* of the Net Settlement Fund will be distributed to Class Members in the form of a check or escrow credit. *Agreement,* ¶¶ 29-32. If checks mailed to Class Members are returned as undeliverable, a search to find a new address will be conducted, and the check will be re-mailed. *Id.* ¶ 37. Class Members will have 180 days to cash their checks. *Id.* ¶ 38. If, after all of this takes place, over $750,000 remains in the settlement fund because of undeliverable or uncashed checks, *only then* will a *cy pres* donation be made, to the

---

pursuing frivolous appeals of objections to class action settlements… [The objector's] relationship with Bandas, a known vexatious appellant, further supports a finding that [the objector] brings this appeal in bad faith."); *In re Wal-Mart Wage and Hour Employment Practices Litig.*, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) ("[T]he Court finds that the objections are not supported by law or the facts and are indeed merit less [sic]."); *In re LivingSocial Mktg. & Sales Practices Litig.*, 2013 WL 1181489 at *17 (D.D.C. Mar. 22, 2013) ("The objections to the settlement terms are largely meritless."); *In re CertainTeed Fiber Cement Siding Litigation*, ECF No. 129, at 1 (E.D. Pa. 2014).

[21] The Halls' objections regarding attorneys' fees are addressed separately in Plaintiffs' Reply Brief in support of their Motion for Attorneys' Fees and Expenses.

Center For Responsible Lending.  Finding little else about the Settlement to object to, the Halls put forward two criticisms regarding this potential *cy pres* award, which are both meritless and not ripe for review.

In a settlement of this type, objections to potential *cy pres* donations are not ripe at final approval.  In a case affirming final approval of a similarly-structured settlement fund, the Ninth Circuit held:

> [T]his issue [the propriety of the *cy pres* donation] becomes ripe only if the entire settlement fund is not distributed to class members. *See Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1313 (9th Cir.1990) (Fernandez, J., concurring). That trigger point has not been reached; no *cy pres* disbursement is imminent; and the fund in this case may well be depleted before *cy pres* kicks in. We therefore decline to consider the propriety of *cy pres* at this time.

*Rodriguez*, 563 F.3d at 962.  This Court should do the same.

Even if this Court considers the merits of the Halls' arguments – which it should not – the objection should be overruled.  First, with no citation to the facts of the case or any legal authority, the Halls object to the $750,000 threshold at which a *cy pres* donation would be made. This amount, however is entirely reasonable.   Considering that approximately 313,000 Settlement Class members are ***automatically*** entitled to monetary relief, and claims have been received from over 100,000 Settlement Class members (many of whom are not entitled to automatic payments), a residual of $750,000 would mean that Class members would, on average, be entitled to a supplemental payment of approximately $2.00.[22]  This amount, however, would be drastically reduced by the administrative costs of undertaking a second distribution (envelopes, postage, processing etc.), to say nothing of the costs of determining each Class

---

[22] Under the Settlement, any redistribution would be made only to those class members who received their first payment.  *Agreement, ¶ 39.*  Thus, any second distribution would be to a slightly smaller population than the first distribution.

member's *pro rata* share of the remaining fund.   A redistribution of a $750,000 (or less) remainder is simply not economically rational, and a *cy pres* donation is the only reasonable method of dealing with such a circumstance.

The Halls also criticize the *cy pres* recipient in this case, the Center for Responsible Lending, as not sufficiently related to the subject matter of the litigation.   To the contrary, this case was about the relationship between lenders and borrowers.   There is simply no more specific charitable cause the *cy pres* donation could go to.   Certainly, there is no foundation devoted to issues surrounding LPI.   The Halls are unsurprisingly silent on the issue of where, exactly, the *cy pres* donation would be better directed.

Furthermore, the case relied upon by the Halls is easily distinguishable.   In *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012), the settlement was structured such that class members claimed approximately $800,000 of a $2.75 million settlement, with the vast majority going to *cy pres*.   *Id.* at 683.   In contrast, in this case, the entirety of the fund is paid out, with a *cy pres* donation **only** issuing if there are uncashed checks after 180 days, and those checks constitute less than 2.5% of the Settlement Fund ($750,000 / $31,000,000 = 2.4%).   This circumstance raises none of the red flags present in *Kellogg*.

Unrelated to *cy pres*, the Halls' filing contains a number of objections that demonstrate a lack of understanding of the Settlement, and appear simply to be boilerplate assertions.   For example, the Halls "object to the class notice to the extent it suggests that personal attendance at the fairness hearing is a requirement…"   *Hall Objection at 6*.   However, the Class Notice suggests no such thing.   To the contrary, it explicitly states: "You may, but are not required, to attend this hearing."   *Simmons Decl., Ex. 1 at 8*.   Similarly, the Halls object "to any procedures or requirements to object that require information or documents other than those contained

herein and/or that are not listed in the class notice …"  *Hall Objection at 5*.  Once again, no such

requirement exists.  Finally, the Halls state that they "join in and incorporate herein by reference

any and all objections filed by other objectors as though set forth in full[.]"  *Hall Objection at 5*.

This language is designed to allow the Halls to latch onto – and potentially appeal – any

objection made by any party.  This is improper, states no basis for objection, and is not

allowed.[23]  Accordingly, the Halls' objections should be overruled in their entirety.

### 3.        The Vitales' Objections Are Meritless

Francis and Dorothea Vitale ("the Vitales"), *pro se* objectors, raise five separate

objections to the Settlement, which are all meritless.  These objections are addressed *ad seriatim*.

The Vitales' first point relates to the form allowing Settlement Class members to opt out

of BoA's flood insurance coverage requirement.  The Vitales object that "the onus is on Class

Members to request a Flood Coverage Opt-Out Form*," Vitales Objection at 1*, but this criticism

is misplaced.  While it is true that, under Paragraph 19 of the Settlement Agreement, Class

Members have the right to request a Flood Coverage Opt-Out form, the Vitales overlook

Paragraph 20, which provides that this form must be provided ***automatically*** with every letter

that BoA sends to borrowers for the next three years requesting that they increase their flood

insurance coverage.  The Vitales also object that Class members must return the form within 35

days after it is sent.  However, this period of time is reasonable, and ***longer*** than the period of

time that borrowers have to respond to other correspondence, such as their monthly mortgage

statements.  Moreover, to the extent that the 35-day period expires, borrowers may simply

---

[23] 7B Fed. Prac. & Proc. Civ. § 1797.1 (3d ed. 2005) ("Only clearly presented objections…will be considered."); *Larson v. Sprint Nextel Corp.*, 2010 WL 234934, *14 n. 27 (D.N.J. Jan. 15, 2010) *vacated on other grounds by Larson v. AT & T Mobility LLC*, 687 F.3d 109 (3d Cir. 2012) (objectors could not incorporate by reference the withdrawn objection of another class member).

request a new Flood Coverage Opt-Out form, thereby re-triggering a fresh 35-day period. Accordingly, the Vitales' criticisms of the procedures surrounding the form are unfounded.

The Vitales' second point is mostly a restatement of their first. To the extent it is distinguishable, it appears to criticize the fact that the prospective relief in this case lasts for three years, and not indefinitely. This, however, is a standard term, for the simple reason that indefinite prospective relief in a case such as this would likely cause problems in the future, as Defendant's business, the financial system, and the regulations governing it evolve in ways that cannot be anticipated at this time. Notably, the consent judgment that BoA entered into as part of the National Mortgage Settlement contains a similar sunset provision, and provides that it will be in force for three and a half years. *U.S. v. Bank of America Corp.* No. 12-cv-00361, ECF No. 11, ¶ 15 (D.D.C. March 4, 2012). Accordingly, there is nothing objectionable about the three year time horizon in this case. *See Sullivan v. DB Investments, Inc.*, 2008 WL 8747721, *24 (D.N.J. May 22, 2008) ("[T]he injunctive relief being… shorter in duration than absolutely possible does not render the injunction 'inadequate.'") (citation omitted).

The Vitales' third objection relates to attorneys' fees and is addressed separately in Plaintiffs' Reply Brief in support of their Motion for Attorneys' Fees and Expenses.

Fourth, the Vitales object that the Settlement contains a release of claims. This is the basic structure of class action settlements: compensation in exchange for a release. In seeking compensation without a release, the Vitales are seeking something for nothing. Moreover, as set forth above and in Plaintiffs' Preliminary Approval Memo, the release in this case is narrowly tailored to only flood insurance-related claims and is not a broad, all-encompassing release as the Vitales seem to imply.

Finally, the Vitales contend that "there don't seem to be any fines or penalties against BANA." *Vitale Objection at 2*.  In response, Plaintiffs contend that $31,000,000 is, in fact, a substantial fine or penalty.  To the extent that the Vitales complain that the Settlement does not recover over and above the damages to the Class, the Vitales simply misunderstand the basic nature of settlements as compromises in which neither side receives all that they want.  Accordingly, the Vitales' objections should be overruled in their entirety.

### 4.        The Neumann Objections Are Meritless

Erich B. Neumann, a class member attorney representing himself, raises certain objections to the Settlement, citing no authority.  These objections are unsupported, and as discussed below, a number of these objections appear formulaic and do not demonstrate familiarity with the Settlement.

First, Neumann complains that the prospective relief in this case expires after three years.  This objection already has been addressed in response to the Vitales' objection.  *See supra* at 32.

Second, Neumann suffers from the same misunderstanding as the Vitales regarding the provision of Flood Coverage Opt-Out forms to Class Members.  As noted above, these forms will be provided ***automatically*** with every letter that BoA sends to borrowers for the next three years requesting that they increase their flood insurance coverage.  *See supra* at 31 (*citing* Settlement Agreement, ¶ 20).  The fact that Class members also have the right to request a Flood Coverage Opt-Out form at any time makes the Settlement even better, not worse.  Neumann also argues that the Flood Coverage Opt-Out form should be provided to the Court for review and approval.  However, this objection ignores the fact that the form already was provided to the Court as Exhibit C to the Settlement Agreement.  *See ECF 237-1 at 66-67*.

Third, Neumann objects that Plaintiffs' "class action brief" was filed under seal. However, pursuant to this Court's Local Rules, that brief was required to be filed under seal in its entirety because it referenced many documents and a great deal of information subject to the Protective Order in this case. *See* L.R. 3-8(a) ("Portions of a document cannot be placed under seal. Instead, the entire document must be placed under seal in order to protect the confidential information."). Moreover, this objection ignores the fact that Plaintiffs' Preliminary Approval Memo and all settlement documents were filed on the public docket and are also publicly available on the settlement website. *See* www.floodinsurancesettlementbana.com. To the extent this point also criticizes the amount of recovery, Plaintiffs incorporate Section III.B.1, *supra* at 11-12.

Fourth, Neumann contends that BoA's option to compensate Class Members with active accounts via an escrow credit is somehow inappropriate. This is incorrect. LPI charges are paid for out of borrowers' escrow funds, and there is nothing inappropriate about the award in this case – effectively a partial refund of premiums – being paid back in the same manner. Escrow credits are real funds, which are used to fund real obligations, such as property taxes and insurance, which provide real benefits to borrowers. Every dollar that this Settlement pays into a Settlement Class member's escrow account is a dollar that the Class member will not have to pay in connection with his or her monthly mortgage payment (which includes principal, interest, taxes, and insurance, or "PITI"). Additionally Neumann is incorrect to say that Class Members will not know they are being compensated. Among other things: (1) they have received the court-approved Class Notice (which satisfies the requirements of Rule 23); (2) they receive monthly mortgage statements showing the activity on their account (including escrow charges

and credits); and (3) they also receive an annualized escrow statement once a year by law.  *See* 12 C.F.R. § 1024.17.

Neumann's fifth objection relates to attorneys' fees, and is addressed separately in Plaintiffs' Reply Brief in support of their Motion for Attorneys' Fees and Expenses.

Sixth and finally, Neumann spends three sentences criticizing the scope of the release in this case.  Neumann provides no citations or justification for his assertion that the release is illegal or violates of public policy.  The fact is that class action settlements commonly release all claims that were asserted *or could have been asserted* by class members in the action, in exchange for the relief that that is provided by the settlement.  *See Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 244 (D.N.J. 2005) (overruling objection, listing cases).  Moreover, as noted above with regard to the Vitales' objections, the release here has been narrowly tailored to encompass only flood-insurance-related claims.  Those who are uncomfortable with the scope of the release had the opportunity to opt out.[24]  Accordingly, Neumann's objection on this point, and all of the other points he raises, should be overruled.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter Plaintiffs' accompanying proposed Final Approval Order.

---

[24] To the extent Neumann would prefer to opt-out now that his objections have been dealt with, Plaintiffs would not object to a request by him for the Court to treat his objections as a timely request to opt-out and exclude himself from the Settlement.

Dated:  August 26, 2014       Respectfully submitted,

NICHOLS KASTER, PLLP


By:____/s/ Kai Richter_____
**Kai Richter** (admitted *pro hac vice*)
Email: krichter@nka.com
**E. Michelle Drake** (admitted *pro hac vice*)
Email: drake@nka.com
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile:  (612) 215-6870

**Timothy S. DeJong**, OSB No. 940662
Email: tdejong@stollberne.com
**Scott A. Shorr**, OSB No. 961873
Email: sshorr@stollberne.com
**Nadine A. Gartner**, OSB No. 103864
Email: ngartner@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C
2500 SW Oak Street, Suite 500
Portland, OR  97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

**Shanon J. Carson** (admitted *pro hac vice*)
Email: scarson@bm.net
**Patrick F. Madden** (admitted *pro hac vice*)
Email: pmadden@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604

**Brett Cebulash** (admitted *pro hac vice*)
Email: bcebulash@tcllaw.com
**Kevin S. Landau** (admitted *pro hac vice*)
Email: klandau@tcllaw.com
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
Facsimile: (212) 931-0703

36

**Edward F. Haber** (admitted *pro hac vice*)
Email: ehaber@shulaw.com
**Adam M. Stewart**(admitted *pro hac vice*)
Email: astewart@shulaw.com
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, MA  02210
Phone: (617) 439-3939
Facsimile: (617) 439-0134

**Attorneys for Plaintiffs and the Settlement Class**